Argued 24 January; decided 20 March, 1899.

## PATTERSON *v.* PORTLAND SMELTING WORKS.

[56 Pac. 407.]

1. CORPORATIONS—GOOD FAITH OF DIRECTORS.—In a suit to set aside a public sale of corporate property because the directors had not acted in good faith in the matter it appeared that the directors made several unsuccessful attempts to find purchasers; that one of the creditors visited nonresident parties, whom he unsuccessfully tried to interest; and that several persons were taken to view the property. The directors refused a proposition to give a broker an exclusive right to sell for a certain period, but informed him that they would entertain propositions from purchasers procured by him. `Held sufficient to show that the directors made reasonable efforts to dispose of the property at private sale.

2. SALE OF CORPORATE PROPERTY—SUFFICIENCY OF NOTICE.—A public sale of corporate property, described by metes and bounds, will not be set aside because the advertisement did not show the improvements, if there is no evidence that if it had been more fully described it would have brought a greater sum than was realized.

3. RESALE OF PROPERTY—HIGHER OFFER.—Evidence that a person would have bid more at a public sale of property, if he had known of the sale, is insufficient to avoid the sale for defective advertising, where, on cross-examination, it appeared that he did not have available funds to make the purchase.

4. SALE—DESCRIPTION OF PERSONALTY.—A public sale of corporate realty will not be set aside because the advertisement did not mention certain personal property situated on the land, as the personal property did not pass by the sale.

5. SALE OF CORPORATE PROPERTY BY DIRECTORS—TERMS.—A sale of corporate property will not be set aside on the ground that the advertisement discouraged bidders by providing that the sale should be for cash, since the directors could sell on no other terms.

6. POWER OF DIRECTORS TO SELL CORPORATE PROPERTY.—Where stockholders confer on the directors the power of disposing of corporate property, the directors may delegate the performance of purely ministerial duties connected with the sale to the president and secretary, if the discretionary matters are reserved under the control of the directors.

7. CORPORATION—MORTGAGE TO DIRECTOR.—Notwithstanding the fiduciary relation that exists between a stockholder or director and his corporation, he may loan it money, taking its property as security, or he may buy the corpo-

rate property at a sale held to pay its debts, but the transaction must be un-
questionably fair, and the burden of proof as to that rests on the lender or
buyer: *Jones* v. *Hale*, 32 Or. 465, cited.

8. SALE OF CORPORATE ASSETS—ADEQUACY OF CONSIDERATION.—The engineer
in charge of the construction of a smelting plant testified that it cost $65,000.
An expert testified that it could be duplicated for $25,000. In addition to the
original cost, $20,000 was expended in improvements, but a part of the build-
ings and machinery was in bad repair, and the cost of materials and the
fall in the price of the product made the operation of the plant unprofitable.
*Held,* that purchasers of the plant at $9,500 paid full value therefor.

From Multnomah :     LOYAL B. STEARNS, Judge.

This is a suit by Thomas Patterson, James Lotan, and
Julius Ordway to set aside a sale of the real property
of an insolvent corporation to a director thereof.   The
transcript shows that the Portland Smelting & Refining
Works, a corporation, being in need of funds to carry on
the business in which it was engaged, twenty-one of its
stockholders, including the plaintiffs, on February 8,
1892, in consideration of the corporation pledging to
them its property as security therefor, executed to it their
several promissory notes, aggregating $100,000, which it
indorsed to the Bank of British Columbia as collateral
security for such of its overdrafts as the bank might
honor ;   that, the business of smelting ores having been
operated at a loss, and the corporation being indebted on
account of said overdrafts, its stockholders, at a meeting
thereof, held February 24, 1894, having determined to
wind up its affairs, adopted, *inter alia*, the following
declaration :   "*Resolved, further*, that the board of di-
rectors be, and they hereby are, authorized to make sale
of the corporate property, and reduce its other assets to
money, on the best terms procurable, and at the earliest
practicable date, and from the proceeds of sale and other
assets to satisfy the indebtedness of the corporation, dis-
tributing the overplus, if any, among the stockholders in
proportion to their holdings of stock ;   and since the per-
sons who now fill the office of directors have heretofore,

35 OR.—7.

along with other stockholders, assumed large liabilities on behalf of said corporation, and in order to save themselves from loss said directors and stockholders may be compelled to look to the corporate property for redress, and may alone, or in connection with others, be compelled to buy said property, or some part of it, if no other purchaser can be found, it is hereby resolved that said property be advertised by said directors at such time as in their judgment will be likely to produce the best results, for sale at public auction, in the same manner and for the same length of time as is required for the sale of real property on execution by the laws of this state, and that upon such sale any directors and stockholders may become purchasers of said property, provided they are the highest bidders ; but if any outside purchaser for said property at private sale can be found at any time at a price satisfactory to the directors, and in their judgment it shall be expedient to sell to such purchaser rather than to hold the property for such public sale, then, and in that event, said directors are authorized to make sale to such purchaser at such price, and on such terms, as in their discretion they may determine.''

Thereafter the bank, desiring to obtain a settlement of its account for the money advanced to the corporation on the faith of the collateral securities which the latter had assigned to it, demanded payment thereof from the makers of said notes, in pursuance of which the sum of $38,892.36, including the principal so advanced and interest thereon, together with the sum of $268, expenses incurred by the bank in the case of *Patterson* v. *Bank of British Columbia*, 26 Or. 509 (38 Pac. 817), was paid or secured to it between July 26, 1894, and October 15 of that year, by the following named makers of said notes, to wit: Honeyman, DeHart & Company, Charles Hegele, T. Wolff, J. McCraken, J. Kiernan, J. W. Cook, E. G.

Harvey, W. W. Spaulding, K. A. J. Mackenzie, and R.
B. Knapp. The Board of Directors of the Portland
Smelting & Refining Works, being unable to effect a
private sale of the corporate property, resolved, at a.
meeting held November 17, 1894, that it was not advis-
able to further delay the execution of the stockholders'
resolution; and thereupon directed the president and
secretary to make a sale of said property, and apply the
proceeds arising therefrom in satisfaction of the corpo-
rate debts, and requested the bank to assign to those
who had discharged the obligations of the corporation
the notes of those who had not participated therein.
In pursuance of the directors' resolution, J. McCraken,
president, and Edward G. Harvey, secretary, of said cor-
poration, published in the Weekly Oregonian a notice to
the effect that the Portland Smelting & Refining Works,
describing it by metes and bounds, together with the
tenements, hereditaments and appurtenances thereunto
belonging, or in any wise appertaining, would be sold
in front of the door of the court house in Multnomah
County on Monday, January 21, 1895, at the hour of 11
o'clock in the forenoon, to the highest bidder for cash.
At the time so appointed, the premises were sold for the
sum of $9,550 to J. Kiernan, in trust for the persons
above named, who had discharged the indebtedness to
the bank, and at a meeting of the board of directors,
held February 19, 1895, said sale was confirmed, and
thereafter a deed of said property was executed to the
purchasers.

The plaintiffs, T. Patterson, James Lotan, and Julius
Ordway, who had joined the eighteen other stockholders
in executing promissory notes as collateral security for
the corporation, but who had not participated in dis-
charging the obligation thereby incurred, instituted this
suit, alleging the facts, in substance, as hereinbefore

stated, and that the directors of the corporation, in pursuance of a fraudulent design and with intent to injure the other stockholders who had become joint sureties by executing said notes, made no reasonable effort to sell said property at private sale or public auction; that the advertisement thereof was inadequate and insufficient to give reasonable notice; that it omitted to describe the machinery, tools, and other personal property, thereby enabling the purchasers to acquire said property at much less than its real value; and that if the sale be set aside, and a receiver appointed to take charge of said property, he could resell the same for a sufficient sum to pay all the debts of the corporation.

The defendant John Kiernan, denying the material allegations of the complaint, avers that he holds the legal title to said property in trust for the makers of said notes who paid the debt of the corporation; that the notes of those who had not contributed to the payment thereof had been assigned to him; and that, if the plaintiffs would pay their proportion of said debt, he would share with them all profit which might be realized in any manner from said property.

The reply having put in issue the allegations of new matter contained in the answer, a trial was had, and from the evidence taken thereat the court found in addition to the facts hereinbefore stated, that the property of the Smelting & Refining Works was not, on the day of the sale thereof, worth the sum of $40,000, nor could it have been sold for a greater sum than was bidden therefor; that the board of directors of said corporation acted fairly; and that Kiernan, and the persons for whom he held the legal title to said property, acted openly, and for the best interests of the corporation, and all who were concerned therein, and was obliged to purchase

said property in default of any other buyers ; and thereupon dismissed the suit, from which decree plaintiffs appeal.                                    AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. Edw. W. Bingham.*

For respondents there was a brief over the name of *Cox, Cotton, Teal & Minor*, with an oral argument by *Mr. Lewis B. Cox.*

MR. JUSTICE MOORE, after stating the facts, delivered the opinion of the court.

1.  It is contended by plaintiffs' counsel that the directors made no reasonable effort to secure a purchaser of the corporate property at private sale, and that the notice of the public sale, as published by their agents, failed to state the character of the property to be disposed of ; that the tract of land upon which the smelter was erected contained sixteen and one-half acres ; but the notice of sale imparted no information of its area ; that the property had a frontage of three hundred and ninety-three feet on the ship channel of the Willamette River, a convenient wharf extending thereunto, and a tramway one thousand feet in length leading from the wharf to the works, of which the notice of sale made no mention ; that the plant was equipped with costly roasters, furnaces, smoke flues, and stacks, portable and stationary engines, pumps, fans, a donkey engine, large track scales, assaying implements, besides a lot of machinery that had not been set up, much of which was portable, and could have been profitably used elsewhere ; but no reference to any of these articles was made in the notice of sale, in consequence of which Kiernan was fraudulently enabled to obtain such property without paying an adequate compensation therefor. The evi-

dence tends to show that the directors, in pursuance of the authority conferred upon them, made several ineffectual efforts to find a purchaser for the property ; that McCraken visited some parties in New Jersey, whom he tried to interest in the works, but failed to induce them to purchase the same ; and that several persons were taken by members of the board to Linton, with a view of selling the property to them, but without avail. The plaintiffs complain because one A. E. Borthwick, a real estate broker, and one of the stockholders of the corporation, was not given a contract by which he would have the exclusive right to sell the property. Borthwick having corresponded with several parties, hoping thereby to find a purchaser, applied to the directors for a contract giving him the exclusive right for six months to consummate a sale of the property, but they declined to enter into an agreement of that character, claiming that it might serve to tie up the property for a longer period than was desirable. Besides, it was thought that they might be able to find a purchaser themselves. He was told, however, that if, at any time, he could induce any one to make a bargain for the plant, they would entertain any proposition that he might desire to offer. Borthwick was unable to find a purchaser, but we think his failure to obtain the contract which he sought did not hinder him from effecting a sale or prejudice plaintiffs' rights in the matter ; and we also think that the evidence shows that the directors made a reasonable effort to dispose of the property at private sale.

2.   The notice of public sale described one of the bounds of the real property as extending "to low-water mark on the Willamette River ; thence southerly, following the meanders of said river at low-water mark, three hundred and ninety-three (393) feet, to the northerly line of a tract of land owned by the heirs of A. Meier, de-

ceased;" but in all other particulars, to which excep-
tions are made, as hereinbefore enumerated, said notice
failed to specify the peculiar characteristics which tended
to render the property valuable, either as a smelting
plant or for other business purposes. It, however, ac-
corded with the resolution of the stockholders, in that it
was published "in the same manner and for the same
length of time as is required for the sale of real property
on execution by the laws of this state:" Hill's Ann.
Laws, § 291, subd. 2. If by a detailed specification of
each piece of machinery, and a minute description of
the land, its area and relative situation, and a particular
enumeration of the improvements placed thereon, a pur-
chaser could have been found who would have paid
more than was offered therefor by Kiernan, some reason
might be assigned for setting aside the sale; but the
evidence fails to show that any person would have pur-
chased the property for a greater sum, though it had
been advertised with the particularity indicated in speci-
fying the directors' failure in this respect.

3.   One witness, who said that if he had known of
the sale of the property when it was made he would
have offered a greater sum than was realized thereat,
on cross-examination would not say that he had, of
available funds, the sum of $1,000 which he could
have offered therefor.

4.   The personal property of the corporation not hav-
ing been described at all, the title thereto did not pass to
Kiernan, and hence plaintiffs are not prejudiced thereby,
unless an injury to such property may have resulted by
reason of the directors' failure to sell it; but that ques-
tion is not in issue in this suit.

5.   The sale was advertised to be for cash, and it is
maintained that this requirement necessarily imposed
upon a buyer harder terms than if time had been given,

and had a tendency to discourage would-be purchasers. Kiernan having credited the amount of his bid upon the debt which he and his associates had discharged at the bank, complaint is made that the other creditors of the corporation, and the sureties who had joined in the execution of the guaranty notes assigned to the bank, were not offered a like privilege. An offer by any other person than the judgment creditor to purchase property at a sheriff's sale thereof upon execution, must be an unconditional bid (*Chapman* v. *Harwood*, 44 Am. Dec. 736; *Swope* v. *Ardery*, 5 Ind. 213; *Isler* v. *Andrews*, 66 N. C. 552); for the sheriff, upon the return of the writ, is required to pay the proceeds of the sale to the clerk, who must apply the same, or so much thereof as may be necessary, in satisfaction of the judgment (Hill's Ann. Laws, § 296, subd. 3). But if the judgment creditor becomes the purchaser at such sale, it would be an idle ceremony for the sheriff to exact the payment of the purchase price, which the clerk must ultimately return to the purchaser.: *Russell* v. *Gibbs*, 5 Cow. 390; *Nichols* v. *Ketcham*, 19 Johns. 83. The directors were, therefore, compelled, under the stockholders' resolution, to advertise the sale of the property for cash; but, failing to find a purchaser, Kiernan was obliged to bid in the property, and, as he and his associates were creditors of the corporation to whom the proceeds of the sale would have to be ultimately paid, it was not necessary for the person conducting the sale to demand, or for him to pay, the amount so bid by him. From a careful perusal of the evidence before us, we cannot think there was any disposition on the part of the directors, or of the president or secretary, of the corporation, to publish a notice which was calculated to or did deceive any one, or that plaintiffs were injured in any manner by the notice so published.

6.  It was argued that, the stockholders having con-
ferred upon the board of directors authority to sell the
corporate property, such delegation of power required in
its performance the exercise of discretion and judgment
on the part of those upon whom it had been bestowed,
and, the duty thus imposed being private in its character,
the board was powerless to authorize the president and
secretary to consummate such sale, which should be set
aside.   A private corporation, organized under the laws
of this state, may, at any meeting of the stockholders
called for that purpose, by a vote of a majority of the
stock, authorize the dissolution of such corporation, the
settling of its business, and the disposing of its property :
Hill's Ann. Laws, § 3235.   The statute having prescribed
the source from which emanates the authority for wind-
ing up the affairs of a corporation and liquidating its
debts, the origin thus provided is exclusive :  3 Thomp-
son, Corp. § 3986;   *Moore* v. *Willamette Transportation
Co.,* 7 Or. 359;   *Willamette Falls Co.* v. *Kittredge,* 5 Sawy.
44 (Fed. Cas. No. 17,105).   Under the maxim, *"Delegatus
non potest delegare,"* if the exercise of any measure of dis-
cretion or judgment was necessary on the part of the
board of directors, in conducting the sale of the corporate
property, the authority to dispose of the same by a less
number than all the members of the board could not be
conferred, except by the stockholders, in whom the power
under the statute is lodged :  1 Am. & Eng. Enc. Law
(2 ed.), 972;   *Loeb* v. *Drakeford,* 75 Ala. 464.   And, if
the board did not possess the power to authorize the pres-
ident and secretary to conduct the sale, no ratification by
that body, such as a confirmation of the sale, could give
validity to an act which the board was incapable of au-
thorizing before it was performed.   But where the act to
be accomplished is ministerial only, and relates to the
performance of a private duty, a less number than those

to whom the power has been delegated may properly execute it: *Saltmarsh* v. *Spaulding*, 147 Mass. 224 (17 N. E. 316). In that case Mr. Justice DEVENS, in speaking of the authority of a president and treasurer of a foreign corporation to execute a mortgage of its property in pursuance of a resolution of its board of directors, says: "The directors delegated no discretionary power. They determined upon the mortgage, and made the president and treasurer simply the agents to execute formally that which they themselves had voted to do." "A ministerial act," says Mr. Justice PERKINS in *Flournoy* v. *City of Jeffersonville*, 17 Ind. 169 (79 Am. Dec. 468), "may, perhaps, be defined to be one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done." See, also, as illustrating this definition, *School Dist.* v. *Lambert*, 28 Or. 209 (42 Pac. 221). It will be remembered that the directors were authorized by the stockholders to make sale of the corporate property at the earliest practicable date, and that the sale should be advertised by them at such time as in their judgment would be likely to produce the best results at public auction. The directors, on November 17, 1894, exercised the measure of discretion and judgment theretofore conferred upon them, and, having done so, the sale in pursuance thereof by the president and secretary was the performance of a ministerial duty, in which the agents thus appointed had no discretion but to obey the orders of the board of directors, and hence the officers named possessed plenary power, and were authorized to sell the corporate property in the manner indicated.

7. It is maintained that the property of the corporation constituted a trust fund, to be distributed among

the stockholders in proportion to their several holdings, after the corporate debts had been paid; that the directors were the trustees of such fund, and the law imposed upon them the duty of so managing the property committed to them as to promote the best interests of the beneficiaries; that this fiduciary relation precluded the directors, and each of them, from becoming purchasers of the corporate property at their own sale thereof; and, this being so, equity requires that the sale should be set aside. That a person cannot serve two masters is a truism out of which has been evolved the legal doctrine that an agent cannot act so as to bind his principal when he has an adverse interest of his own to subserve, and hence an agent employed to sell property cannot ordinarily become the purchaser thereof: Story, Ag. § 210 *et seq.* But, notwithstanding the fiduciary relation which exists between a principal and an agent, it is often necessary for a corporation to borrow money or to incur debts in the purchase of property to enable it successfully to carry on the business in which it is engaged, and, as the stockholders and officers of a corporation are presumed to be the persons who are most interested in its success, they may advance money and loan credit to it, and, in doing so, they are, as far as the particular transaction is concerned, to be regarded as strangers, and thereby acquire the same rights which inure to strangers: 4 Thompson, Corp. § 4460; *Gould* v. *Little Rock, etc. Ry. Co.*, 52 Fed. 680; *Harts* v. *Brown*, 77 Ill. 226; *Illinois Steel Co.* v. *O'Donnell*, 156 Ill. 624 (47 Am. St. Rep. 245, 41 N. E. 185); *Forster* v. *Mullanphy Planing Mill Co.*, 16 Mo. App. 150; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Gordon* v. *Preston*, 1 Watts, 385. When a director of a corporation, who is its creditor, obtains the legal title to its property at a judicial or other public sale, and the *bona fides* of the transaction is assailed in a direct proceeding

in equity to set aside the sale, the burden is cast upon the purchasing director of showing that the property produced at such sale the full value thereof: 3 Thompson, Corp. § 4071; *Jameson* v. *Coldwell*, 23 Or. 144 (31 Pac. 279); *Jones* v. *Hale*, 32 Or. 465 (52 Pac. 311); *Wilkinson* v. *Bauerle*, 41 N. J. Eq. 635 (7 Atl. 514).

8. The defendant Kiernan, and those for whom he purchased the property, having been obliged to pay the corporation indebtedness, thereby became its creditors; and, such being the case, the remaining question to be considered is whether, at such sale, they paid the full value of the property. It is difficult to ascertain from the evidence, with any degree of certainty, the original cost of the smelting plant. The engineer who had charge of its construction, and who seems to speak with much care, estimates that the land, buildings, wharf, improvements, and machinery cost about $65,000. An expert in such matters, however, who examined the property for some persons who at one time contemplated purchasing stock of the corporation, was of the opinion that the whole plant could be duplicated for about $25,000. In addition to the original cost, about $20,000 of the money so advanced by the Bank of British Columbia was expended by the corporation in building four fire-clay brick roasters, but at the time of the sale the arches of these roasters had fallen, the corrugated iron on the roof of the building had been very much damaged by escaping gases, and the roof had fallen in by reason of an unusual weight of snow, doing considerable damage to the machinery. The evidence also tends to show that the cost of transporting fluxing materials from the various mines where they could be obtained to Linton, and the decline in the price of silver, had rendered the reduction of argentiferous ores unprofitable, in consequence of which the plant had become nearly valueless for the purpose

for which it was constructed; that for any other use to which the property could be put the sum which was realized therefor was all that could have been obtained; and, the defendant having paid the full value of the property, it follows that the decree is affirmed.

AFFIRMED.