McCLEAN v. BRADLEY et al.

GARDINER et al. v. SAME.

(District Court, N. D. Ohio, E. D. April 1, 1922.)

Nos. 581, 582.

1. Corporations ⬥320(4)—Defunct corporation held not necessary party to stockholders' suit against directors.

A defunct corporation is not an indispensable party to a suit by stockholders to set aside a chattel mortgage sale to directors and for an accounting for profits, where the statute made the last directors trustees to liquidate the corporation for benefit of creditors and stockholders, and no creditors were complaining.

2. Corporations ⬥575—Immaterial that allotment of stock on reorganization was unfair, when stock now worthless.

That the reorganization of a corporation was not fairly made, in that members of a committee were given more shares in proportion to the amount subscribed than other stockholders, is immaterial, except as it may evidence motive, design, or intent, where the stock is now worthless.

3. Corporations ⬥316(1)—Chattel mortgage voidable, where mortgagees were directors and necessary to constitute quorum when mortgage authorized.

A chattel mortgage given directors by a corporation might have been avoided by the stockholders or rescinded by the corporation, on return of the immediate consideration, where three of the mortgagees were directors and voted for the mortgage, and without them there would have been no quorum, especially where the required consent of two-thirds of the stockholders was not obtained.

4. Corporations ⬥198—Proxy authorized to represent stockholders in ratifying chattel mortgage made without compliance with charter.

The ratification at a stockholders' meeting of a chattel mortgage made without the required consent of two-thirds of the stockholders, and authorized at a directors' meeting at which there was no quorum present, excluding directors who were also mortgagees, was a matter within the scope of the corporate business, as to which a proxy, authorized to act for stockholders as fully as if personally present, could represent them.

5. Corporations ⬥316(4)—Chattel mortgage held voidable only, and capable of ratification by majority of stockholders.

A chattel mortgage given corporate directors without the required consent of two-thirds of the stockholders, and authorized at a directors' meeting at which there was no quorum, excluding the mortgagees, was only voidable, and not void, within the rule that a majority may not ratify a void act, where it was free from actual fraud.

6. Corporations ⬥316(4)—Ratification of mortgage to directors by stockholders' meeting was ratification of particular provision therein.

The ratification by a stockholders' meeting of a chattel mortgage to directors, authorized by a directors' vote in which the mortgagees participated, and made without the required consent of two-thirds of the stockholders, was a ratification of a clause therein making all the secured notes due on default as to one.

7. Corporations ⬥481—Sale under chattel mortgage held not to be set aside for want of newspaper notice of sale.

Where notice of sale under chattel mortgage given by corporation to its directors of a number of patents covering inventions relating to fire-

arms, which for 10 years had been the subject of unsuccessful experiment and great loss, was given by letter to each stockholder and to leading arms manufacturers and by posting, the sale will not be set aside several years later for want of formal newspaper notice.

**8. Corporations ⊜═320(3)—Stockholders held estopped by laches to attack validity of chattel mortgage to directors and sale thereunder.**

Stockholders, who had notice of a corporate debt and of the company's insolvency, and of a sale under chattel mortgage to directors, ratified at a stockholders' meeting, and notice of a reorganization, and were invited to participate, but failed to do so, *held* estopped by their laches to attack the validity of the mortgage, the necessity of the sale, and the other steps leading up to the sale.

**9. Corporations ⊜═320(11)—Stockholders, suing to set aside sale under chattel mortgage to directors, held to have burden of disproving laches.**

Stockholders, suing to set aside sale under a chattel mortgage to directors several years after the sale, have the burden of showing, not only that the time of their discovery of the facts absolves them of laches, but also due diligence.

**10. Evidence ⊜═586(3, 4,)—Direct evidence of sending of notice of chattel mortgage sale held to prevail over denial of receipt.**

Direct evidence that notice of a sale under a corporate chattel mortgage was sent stockholders, supported by the production of original notices actually received, and others returned by the post office for want of correct address, prevails over the testimony of stockholders that they did not receive the notice, which may show only their failure to recollect.

**11. Corporations ⊜═320(11)—Burden on stockholders, suing to set aside sale under mortgage to directors, to show it would be inequitable to apply state statute of limitations.**

The burden is on stockholders, suing to set aside a sale under a chattel mortgage to directors, to show that it would be inequitable to apply, by analogy, Gen. Code Ohio, § 11224, barring such actions four years after discovery of the fraud.

**12. Equity ⊜═73—Delay working disadantage essential to laches, but loss of evidence, incapacity of witnesses, etc., sufficient.**

Laches is not mere delay, but delay that works a disadvantage to another, which disadvantage may consist in the loss of evidence, the incapacity of witnesses, or the obscuring of evidence.

**13. Estoppel ⊜═93(1)—Permitting purchasers at chattel mortgage sale to develop inventions held element of estoppel.**

Permitting directors of a corporation, purchasing patents owned by it at a sale under a chattel mortgage, to spend money on their development, was a circumstance of estoppel.

**14. Notice ⊜═6—Knowledge putting on inquiry is notice of what inquiry would reveal.**

Knowledge that would put one of due diligence on inquiry is notice of what reasonably diligent inquiry would have revealed.

**15. Corporations ⊜═320(3)—Limitation of actions ⊜═102(2)—Limitations or laches run in favor of directors.**

Directors are not trustees, in such a sense that the statute of limitations or the doctrine of laches will not run in their favor.

**16. Corporations ⊜═481—Directors, who are mortgage creditors, may purchase at sale to protect themselves.**

Directors, who are also valid mortgage creditors of an insolvent corporation, may to protect themselves purchase property at a legal and regular sale, of which all the stockholders have had due notice, at a price which is full and adequate, provided they strictly observe good faith, and the fact that they constitute a controlling number of the board does not destroy the validity of the sale.

---

⊜═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**17. Corporations** ⬅317(3)—**That directors, purchasing at sale under their mortgage, planned to perfect invention, did not render sale fraudulent.**

That directors of a corporation, purchasing patents at a sale under a chattel mortgage held by them, planned to make an effort to perfect the invention, which had not proved successful, did not itself render the sale fraudulent.

**18. Corporations** ⬅481—**Adequacy of consideration paid at mortgage sale for patents by directors, who were also mortgagees, measured by debt, and not by bid.**

Where directors, who had loaned money to the corporation and taken a chattel mortgage covering patents, purchased them at a sale under the mortgage, and there were no other assets from which they could realize the amount of their debt, the adequacy of the price paid is not measured by their mere nominal bid, but by the amount of their debt.

**19. Corporations** ⬅481—**Directors held to have paid adequate consideration for patents purchased at sale under chattel mortgage.**

The amount of a debt due directors from an insolvent corporation for money loaned by them *held* an adequate consideration for patents relating to machine guns, purchased by them at a sale under their chattel mortgage.

In Equity. Consolidated suits by Samuel N. McClean and by F. A. Gardiner and others against M. A. Bradley and others. Bill dismissed.

Elijah N. Zoline, of New York City, Arthur P. Greeley, of Washington, D. C., E. G. Guthery, of Cleveland, Ohio, and Gilbert H. Baker, of Penn Yan, N. Y., for plaintiff.

Tolles, Hogsett, Ginn & Morley, and John F. Wilson, of Cleveland, Ohio, for defendant.

PECK, District Judge (sitting by designation). This consolidated action in equity is brought by certain stockholders of a defunct New Jersey corporation, known as the McClean Arms & Ordnance Company, to set aside a sale of its patents made to certain of its former directors, the defendants, and for an accounting for profits therefrom received.

The object of the corporation was the development and exploitation of the inventions of Dr. Samuel N. McClean, one of the plaintiffs, relating to machine guns. Some ten years' time and several hundred thousand dollars were spent in this enterprise, which resulted in failure about January 1, 1910. In its final struggles for success, during the latter half of the year 1909, and after all its assets, including its patents, had been mortgaged to a bank for $48,000, four of the directors, Bradley, Brown, Babcock and Cowles, advanced to it $40,600 by seven several loans, and upon the occasion of making the last loan, December 7, 1909, took a chattel mortgage to themselves, second to that of the bank, on the McClean patents and inventions belonging to the company. The machine gun had been tested by the United States Navy Department in June and November, 1909, and had failed, but a new test had been granted, to be made December 23, 1909, and it was to prepare for this final test that the directors made the loan of December 7th.

Early in January, 1910, a gentleman named Henry W. Rudd, who for years had been trying, unsuccessfully, to exploit the gun in Europe, preparatory to a proposed trip to England for the purpose of exhibiting the gun, had it tested in New York City in the presence of Col. I. N. Lewis, an ordnance expert of the army and inventor, to whom

the company had twice previously applied for advice and assistance. The latter disapproved of the gun, and of the water-cooled type of machine guns in general, saying they had had their day. Shortly afterwards Lewis conceived the idea of air cooling by utilizing the blast of the waste gases at the muzzle for suction of air from the breech through an outer casing surrounding the barrel. He proceeded to experiment with this idea on his own account.

On January 12, 1910, the above-named directors, in a circular letter, put the case fairly before the stockholders, disclosing that they had loaned the corporation money, affirming their belief that there was yet value in the property, but giving notice to the stockholders that, unless they came forward with the funds necessary to continue, the assets would be sold to pay the debts. No stockholder responded. On January 17, 1910, a motion to ratify the mortgage to the directors was presented and passed at the annual stockholders' meeting. The secretary reported that without financial assistance the company could not continue, and its property would have to be sold to pay its debts. On January 20th the physical chattels were sold for $15,000, under the aforesaid mortgage to the bank, which amounted to $48,000. In March the leading manufacturers of firearms were addressed by letter, requesting to know if they would be interested in an opportunity to buy the patents. None answered affirmatively.

There being no other assets out of which to satisfy their own claims, on April 27, 1910, the four directors caused notice to be given to all stockholders that the patents covered by "a chattel mortgage given to secure advancements" would be sold on May 13th, and that full information might be had of the signer, Calfee, who was a director and secretary of the corporation, and had been designated in the chattel mortgage as its attorney to execute any necessary transfers to any purchaser under that instrument. Notice of the sale was also sent to the leading manufacturers of firearms, but was not published in the public prints. About the 1st of May, 1910, Col. I. N. Lewis, under pledge of secrecy as to details, advised Bradley of his invention of the air-cooling device, which was still in the experimental state, and his belief in its success. Bradley thought well of the idea, and, without disclosing its details, so advised his three associates, and they agreed to join with him in paying the cost of the necessary experimental work. Lewis agreed to receive nothing for his services unless he achieved success, but in the event of success an equitable allowance was to be made to him. A McClean gun was furnished him by Rudd for experimental purposes, and a former employee of the company was employed to assist him; also a draftsman.

Pursuant to the notice, on May 13th, Calfee offered the patents at public sale, subject to the prior lien of the bank. They were bid in, on behalf of the four directors aforesaid, by his law partner, Fogg, for a sum which is no longer remembered, but which probably was a nominal amount, there being no other bidder. On the same day the bank held a similar sale of the same patents, pursuant to like notice, under its mortgage. Fogg bid $200, but the patents were not knocked down; the bank's attorney regarding the bid insufficient.

The four directors and Calfee, Lewis, and Rudd organized a new corporation, known as the Automatic Arms Company. On June 27th Lewis made application for letters patent on his air-cooling device. The patent issued October 3, 1911. On August 26, 1910, they caused notice to be sent out, signed by Rudd, who was active in the new promotion, to all of the old stockholders, offering them opportunity to subscribe pro rata for the new stock; stipulating, however, that the amount theretofore advanced for exploitation, aside · from company expenditures, approximately $50,000, should be allowed in the new organization, either in cash or stock, and also that subscribers must agree to pay such additional proportionate amount as might be necessary in the judgment of the managers to successfully exploit the business. This letter did not show that the former directors were interested in the new company. None of the stockholders evinced a willingness to subscribe, or even a desire for further details.

On June 2, 1910, an assignment in the name of the McClean Arms & Ordnance Company, by Bradley, president, and Calfee, secretary, was made to the Automatic Arms Company, conveying to it the patents in question. This document was recorded in the Patent Office June 4, 1910. Before August 12, 1910, the four directors settled with the bank, thus securing release of its mortgage on the patents, and upon that date Bradley, Brown, Babcock, and Cowles executed in their own names a further assignment of the patents to the Automatic Arms Company, which was recorded August 16, 1910.

About $5,000 had in the interim been invested by the four directors in Lewis' experiments, and this work, with patents which he had applied for in the meantime, were also turned into the new company. For these assets Bradley, Brown, Babcock, and Cowles received $50,000 at par in the stock of the new company; the defendant Calfee, for his services in the promotion, received $5,000 thereof; and Col. Lewis received $15,000. The sum at which the patents were put into the Automatic Arms Company by the four directors, $50,000, was about the amount of their claims against the old company and their advancements in the interim.

They had been indorsers on the notes held by the bank to the extent of $20,000. The bank held as collateral their stock subscriptions for $12,500, the validity of which they disputed. They settled with the bank for $17,000 and so had acquired by subrogation the bank's lien to the extent of at least $4,500, so that their direct liens on the patents amounted to $45,100 and interest. They were also general creditors of the old corporation to the extent of $3,300, and as such had a claim upon the patents, its only assets. Except for the franchise taxes, and possibly fees due their patent attorney, the bank's claim and their own appear to have been the only debts of the corporation. On January 9, 1911, its franchise was revoked by the state of New Jersey for nonpayment of its corporate excise tax.

The years 1910 and 1911 were spent in experiment and in designing a new gun, which was a radically different arm, although it retained a feature covered by the best claim of the McClean patents, the rearwardly actuated piston and rotating breech block. By June, 1912, four

guns had been made. In March, 1913, a contract was made with the Birmingham (Eng.) Small Arms Company to manufacture the gun. The first 50 guns were turned out in the early summer of 1914, after, according to Lewis, the expenditure of a year and a half's labor by 600 men and $1,500,000. Shortly thereafter the Great War began, and the gun was produced in great quantities and became one of the most effective weapons of the conflict.

From their investment in the Automatic Arms Company the four directors received a dividend upon their stock of perhaps 60 or 70 per cent. in 1915, resulting from the sale of the Lewis and McClean patents by the Automatic Arms Company to the Belgian corporation called Arms Automatique Lewis for cash and stock, in all of the value of $125,000. They then sold their stock in the Automatic Arms Company; Brown receiving par in October, 1915, and the others $200 per share about January 1, 1916. Calfee, who got $5,000 of the Automatic Arms Company stock for his services in connection with the promotion, retained it. The question of the amount of his profit was reserved for an accounting, if one should be found necessary. However, the money received from the Automatic Arms Company was not derived from the McClean gun, but from the light, practical, simple, air-cooled, one-man machine gun designed by Lewis. The four directors thus recouped the amount of their loans to the McClean Arms & Ordnance Company, and gained, as did Calfee, some profit.

The plaintiffs are Dr. McClean, F. A. Gardiner, his wife and children, and the heirs of William G. Montgomery, stockholders. The defendants are M. A. Bradley, one of the four purchasing directors; R. M. Calfee, director and secretary of the corporation, and active in the sale of the patents and promotion of the new corporation; and the Guardian Savings & Trust Company, trustee of the estate of C. W. Cowles, deceased, another one of the purchasing directors. Babcock's estate is joined, but not served. Bradley and Calfee are also sued as trustees of the defunct McClean Arms & Ordnance Company.

The gist of the bill is that the purchasing directors, Calfee and Lewis, conspired to defraud the McClean Arms & Ordnance Company of the McClean patents; that they caused them to be conveyed to themselves, in fraud of the rights of the corporation and its stockholders, and concealed the conspiracy and fraud, so that the plaintiffs did not until recently discover the same, and so could not sooner bring this action. The prayer is that the sale of the patents to the four directors be set aside, that a receiver be appointed for the McClean Arms & Ordnance Company to wind up its affairs, and that an accounting be had of the gains made by the defendants as the result of the said alleged fraudulent transfer.

[1] At the outset we are met by defendants' insistence that this action is one brought in the right of the corporation, that it is what is known as a derivative action, and that in such an action the corporation itself is an indispensable party. This doctrine was held inapplicable by Judge Cooper in the companion case of Gardiner v. Automatic Arms Co., 275 Fed. 697. When the franchise of the corporation was revoked by the state of New Jersey, by the laws of that state the

members of its last board of directors, which included Bradley, Calfee, and Cowles, became trustees for the settlement and determination of its affairs. It was their duty to get in the outstandings, reduce them to cash, pay the creditors, and distribute the balance, if any, to the stockholders. No creditor now complains. Any assets in the hands of the trustees are not for the corporation, as such, but for the stockholders, subject to the claims of the creditors. Any sum recovered would not pass to the treasury of this corporation, but to the corpus of the trust estate. The stockholders, therefore, sue in their own right, not in the right of the corporation. Under such circumstances, there would seem to be no necessity of making the defunct corporation a party, or of allowing the administration of justice to be defeated by the impossibility of getting it and the other defendants into the same court anywhere. Therefore it is thought that the well-settled principle that, when stockholders sue in the right of the corporation, it must be made a party (Davenport v. Dows, 85 U. S. 626, 21 L. Ed. 938) has no application to this case (Southern Pacific v. Bogert, 250 U. S. 483, 488, 39 Sup. Ct. 533, 63 L. Ed. 1099; Ervin v. Oregon Ry. & Navigation Co. [C. C.] 20 Fed. 577; Stearns Coal & Lumber Co. v. Van Winkle, 221 Fed. 590 [C. C. A. 6] 137 C. C. A. 314). Consequently the case is to be considered upon its merits.

The bill alleges that the purchasing directors, Bradley, Cowles, Brown, and Babcock, conspired with I. N. Lewis in January, 1908, to fraudulently possess themselves of the patents of the McClean Company. The proof utterly fails to show such a fact. On the contrary, when, in January, 1908, the McClean Arms & Ordnance Company was facing bankruptcy, the four directors in question were solicited to put in the money necessary to save it and take charge of its affairs. Before so doing they openly consulted Col. Lewis as to the value of these inventions, which at this time had cost some $200,000 and years of labor, and had amounted, in a practical way, to nothing. Lewis spent a half day in Cleveland examining the guns, and there discussed them thoroughly with McClean, and afterwards gave a written opinion, which expressed sufficient belief in the future of the inventions to induce Messrs. Bradley, Cowles, Babcock, and Brown, together with a Mr. Ward, to undertake a reorganization and refinancing of the company.

[2] It is true that the reorganization was not fairly carried out. Each stockholder was to return 75 per cent. of his stock to the corporation. The stock so received was to be redistributed to the stockholders in proportion to the amount of money they should respectively subscribe. The McClean stock was not included in the plan. The distribution of the stock was unfairly made; the members of the committee being given 10 shares per $100 subscribed, and the other stockholders 8. The defendants disclaim all conscious participation in, or knowledge of, this inequality, and attribute it to another member of the committee in charge of the distribution. However this may be, unless relief is granted on other grounds, so that some value may attach to the stock, this matter is now immaterial, except as it may be evidence of motive, design, or intent.

By the reorganization $54,000 was raised, of which Messrs, Bradley, Cowles, Brown, and Babcock subscribed $40,000. This money, together with an additional $40,000 borrowed from the State Savings Bank & Trust Company on mortgage of all assets, was honestly spent without result by March, 1909. Certainly there is nothing for plaintiffs to complain of in the fact that the four directors made the series of loans to the corporation, beginning with that of May 17, 1909, and ending with the loan of $4,000 of December 7, 1909, aggregating in all $40,600. These loans were made in an effort to save the corporation from disaster. There was no other available source of revenue. Their purpose was to provide funds to put the gun in condition to meet the tests of the Navy Department. The loan December 7th of $4,000, which was the occasion for the giving of the mortgage to secure them all, was made after the gun had then recently twice failed, once in June and again in November, at the tests, in hopes that it might be made fit to meet the requirements of the Department at the last opportunity to be afforded upon the 23d of December.

[3] True, the mortgage (but not the debt) might have been avoided by prompt action on the part of the stockholders, as three of the mortgagees, who were among the directors who voted for the mortgage, and without whom there would have been no quorum present, were disqualified by self-interest. Enright v. Heckscher, 240 Fed. 863, 153 C. C. A. 549; also In re Webster Loose Leaf Filing Co. (D. C.) 240 Fed. 779. And the corporation might, by returning the immediate consideration, $4,000, have rescinded the mortgage. Id. 786. Furthermore, the eighth paragraph of the charter made the power of the directors to mortgage its assets conditional upon the assent of two-thirds of the stock, which they did not then have. But on January 12th the letter went out to all stockholders, advising them that, unless they came forward with money, the assets would be sold to meet these and other loans, and upon the 17th of the same month, at the annual meeting of the stockholders, the mortgage was unanimously ratified by 11,278 shares present in person or by proxy out of some 15,000 shares outstanding.

[4-6] The plaintiff F. A. Gardiner was present and voted in person to ratify, and so is indubitably bound. It is contended that the general proxies were not sufficient to bind the other stockholders. It would seem, however, that the submission to the meeting of such a mortgage was a matter within the scope of the corporate business, and so within the power of a proxy authorized to act for the stockholder "as fully as he could do if personally present." Cook on Corporations, § 610. The facts are not similar to those of cases in which it has been held that such a proxy is not authorized to vote in favor of schemes of reorganization and the like, which are not part of the business of carrying on the corporation, but rather subversive of it. Such cases are Farish v. Cieneguita Copper Co., 12 Ariz. 235, 100 Pac. 781, and McKee v. Home Savings Co., 122 Iowa, 731, 98 N. W. 609. Nor do the facts bring the case under the ban of the rule that a majority may not ratify a void act (Tilden v. Barber [D. C.] 268 Fed. 587, 606), or a fraud (Von Arnim v. American Tube Works, 188 Mass. 515, 518, 74

N. E. 680), because the mortgage was, when the stockholders met, voidable at most (3 Cook on Corporations, §§ 653, 730), and free from actual fraud (Id. § 662, p. 2118; In re Eastman Oil Co. [D. C.] 238 Fed. 416, 420).

It is contended that there was no express and specific ratification of the clause that on default as to one note all should become due; but a ratification of a transaction in general terms must be taken as embracing all covenants not unusual thereto. The proxies seem to have been in favor of Calfee. He had no interest in the mortgage, nor does it appear that at the time of the meeting he had any plan of co-operating with the mortgagees in the disposition of the mortgaged patents. It is concluded that the mortgage was valid when ratified on January 17, 1910.

[7] The plaintiffs attack the validity of the sale of the patents on the ground not only of the alleged defects in the mortgage, above considered, but also that there was insufficient notice of the sale given. The notice was by letter to each stockholder and to the leading arms manufacturers and by publicly posting two copies of the same. It would have been better had a formal newspaper notice also been given. But there is no definite legal requirement of such, and, considering the utterly unmarketable type of assets to be sold, a lot of patents covering inventions which had for 10 years been the subject of unsuccessful experiment and great loss, it is most improbable that any newspaper advertising would have brought forth any bid; certainly none larger than the directors' claims. The sale ought not now be set aside on that ground.

[8, 9] Furthermore, the plaintiffs are estopped by laches to question the transaction up to this point, at least; that is to say, they are estopped as to the validity of the mortgage, the necessity of sale, and as to the notice and other steps leading up to the holding of the sale, including its time and place. They had notice of the debt and of the insolvency of the company. The corporation ratified the mortgage. They had notice of sale, and notice of the reorganization, and an invitation to participate. Gardiner and McClean are found to have had actual knowledge of the mortgage in 1910. The burden is upon them to show, not only that the time of their discovery of these facts absolves them of laches, but also due diligence. Wood v. Carpenter, 101 U. S. 135, 140, 25 L. Ed. 807. In this, not only have they failed, but the weight of the evidence is decidedly against them.

[10] A number of stockholders have testified that they do not remember receiving the mailed notices. That is not remarkable after 12 years. Some have testified that they did not receive them. But the direct evidence that they were sent, including the originals in unbroken envelopes returned by the post in some instances for failure of delivery for want of correct address, and originals actually received by others, must prevail over what is believed to be a natural failure to recollect.

[11, 12] The Ohio statute bars such an action in 4 years after discovery of the fraud. General Code of Ohio, § 11224. The burden, after this lapse of time, is on the complainant to show that it would be inequitable to apply the statute by analogy in a federal court. 4 Pomeroy, Equity Jurisprudence, § 1441; Combs v. Watson, 32 Ohio St. 228. It is true that laches is not mere delay, but delay that works a disad-

vantage to another. Such disadvantage, however, may consist in loss of evidence, the incapacity of witnesses, or even the obscuring of evidence. Whitney v. Fox, 166 U. S. 637, 17 Sup. Ct. 713, 41 L. Ed. 1145. And there is a presumption of laches in a case filed so late as this one, which it is incumbent upon plaintiffs to rebut. Foster v. Mansfield R. R. Co., 146 U. S. 88, 99, 13 Sup. Ct. 28, 32 (36 L. Ed. 899). In that case Mr. Justice Brown said:

"The defense of want of knowledge on the part of one charged with laches is one easily made easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law, which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts."

[13, 14] Permitting one who has acquired title to the property to spend money upon its development is in such cases a circumstance of estoppel. Gildersleeve v. New Mexico Mining Co., 161 U. S. 573, 582, 16 Sup. Ct. 663, 40 L. Ed. 812; O'Brien v. Wheelock, 184 U. S. 450, 492, 22 Sup. Ct. 354, 46 L. Ed. 636; Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 590, 23 L. Ed. 328. Knowledge that would put one of due diligence on inquiry is notice of what reasonably diligent inquiry would have revealed. Johnston v. Standard Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585, 37 L. Ed. 480. These principles would certainly debar plaintiffs as to the matters above enumerated.

[15] Plaintiffs, however, claim that the defendants were trustees of an express trust, and that therefore the doctrine of laches has no application. Twin-Lick Oil Co. v. Marbury, supra, seems to be directly to the contrary, holding that the right to avoid a sale to a director must be exercised within a reasonable time. So it seems to be settled that directors are not trustees in such sense that the statute of limitations (or the doctrine of laches) will not run in their favor. See, also, Landis v. Saxton, 105 Mo. 486, 16 S. W. 912, 24 Am. St. Rep. 403; Boyd v. Mutual Fire Association, 116 Wis. 155, 177, 90 N. W. 1086, 94 N. W. 171, 61 L. R. A. 918, 96 Am. St. Rep. 948. It is claimed that the defendants were trustees under the winding-up statutes of New Jersey, if not as directors. A similar situation and a holding adverse to plaintiff's contention seems to be presented in Landis v. Saxton, just cited; and, furthermore, the defendants were not at the time of this purchase statutory trustees, but directors, since the forfeiture of the charter did not take place until a year later, in January, 1911.

The plaintiffs, therefore, are estopped by laches to question the validity of the mortgage, and the proceedings leading up to, and the holding of, the sale. If they have any complaint still open to be made, it must be as to the price, or the fact that the four directors were the purchasers, and that Calfee, another director, as well as secretary, was acting with them, looking to further attempts to develop the invention. The evidence does not show any direct notice to the stockholders that the four directors were the purchasers at the foreclosure sale or that Calfee was interested. It may well be that, if there was fraud, or lack of good faith in the fact that they were the purchasers, or in the sale itself, or inadequacy of consideration, the plaintiffs have still standing in equity to attack the transaction.

**[16]** Directors, who are also valid mortgage creditors, of an insolvent corporation, may purchase to protect themselves, at a legal and regular public sale, of which all stockholders have had due notice, at a price which is full and adequate, provided they strictly observe good faith in all matters pertaining thereto. 3 Cook on Corporations, § 653. See note 1, p. 2063, and note 2, p. 2066. In Twin-Lick Oil Co. v. Marbury, supra, of a director who purchased the court said, 91 U. S. 590, 591 (23 L. Ed. 328):

"Defendant was at liberty to bid, subject to those rules of fairness which we have already conceded to belong to his peculiar position; for, if he could not bid, he would have been deprived of the only means which his contract gave him of making his debt out of the security on which he had loaned his money."

True the court spoke of one of several directors; but it is also to be noted that the court said:

"If he should be a sole director, on one of a smaller number vested with certain powers, this obligation [of uberrima fides] would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness."

And so the fact that a controlling number of the board were here the purchasers does not necessarily destroy the validity of this sale. See, also, McKittrick v. Arkansas Central R. Co., 152 U. S. 473, 14 Sup. Ct. 661, 38 L. Ed. 518; Patterson v. Portland Smelting Works, 35 Or. 96, 56 Pac. 407; Graham v. Carr, 130 N. C. 271, 41 S. E. 379; Foster v. Belcher's Sugar Ref. Co., 118 Mo. 238, 264, 24 S. W. 63 et seq.; Janney v. Minneapolis Industrial Exposition, 79 Minn. 488, 82 N. W. 984, 50 L. R. A. 273; Osborne's Adm'x v. Monks (Ky.) 21 S. W. 101.

The stockholders had, in the letter of January 12th, been asked to come forward and save this corporation. The purchasing directors did not discourage them from so doing, but, on the contrary, advised them that they (the directors) believed "there was yet value in the property of the company," and that, "if the stockholders will provide funds, proportionate to their holdings, with which to continue operations, we will be very glad to co-operate with them," but that, unless they did so, "it will be closed out in payment of its debts," of which part was the debt to the directors, they were advised. As no affirmative response was received, and as no one else was willing to buy the patents, to deny the four directors the right to buy would be to deprive them of the right to collect their just debt. Therefore the fact that the directors were the purchasers, under the circumstances, does not warrant the setting aside of the sale.

**[17]** The fact that the four directors and Calfee then had a plan of venturing still more money upon experiments in an effort to perfect the invention does not necessarily and of itself render the sale fraudulent. Naturally they would look forward to the utilization of that which they expected to buy. The case comes to this: The patents had to be sold. The four directors were entitled to be paid. After reasonable efforts, none other was found to buy. The four directors took in the equity of redemption of the patents, which were subject to the bank's mortgage, on their debt. The situation was not at all that of designing directors,

conspiring to get the assets of their corporation into their own hands at an inadequate price, but rather that of directors who had supported the corporation with personal loans, taking in for what was justly due them assets of certainly no greater value than their debt, and which no one else would buy, after insolvency, when a continuation of the corporation was impossible and its winding up inevitable, and later affording the former stockholders at least some opportunity to subscribe to the stock of the new company, and so participate in any value that there might be in those assets above the amount of the directors' liens.

[18] Was the price adequate? What the directors gave is not to be measured by their mere nominal bid, but, since there were no other assets from which they could realize, by the amount of their debt. Marr v. Marr, 72 N. J. Eq. 797, 804, 66 Atl. 182; in this respect approved in 73 N. J. Eq. 643, at page 647, 70 Atl. 375, 133 Am. St. Rep. 742. Their lien at that time, as has been seen, amounted to some $45,100 and interest, and their unsecured claim to $3,300.

[19] Evidence of the state of the machine gun art at that period has been received as reflecting upon the value of the patents. McClean, whose first application was filed January 20, 1898, was not a pioneer in the field. Maxim (1884), Browning (1895), Odkolock (1891), Mason (1894), and others had already extensively developed that type of machine gun in which the gases of explosion are utilized in securing automatic action. The idea of so utilizing the gases of explosion was disclosed by a British patentee, Lindner, in 1856. The recoil operated type of gun was developed perhaps even earlier than the other. Some of the mechanism is common to both types. Nordenfeld (1886) shows the rotating and reciprocating breech bolt. Maxim (1896) also described a similar breech bolt in a gun of the gas type. In 1884 he described in the same type of gun the rearwardly actuated piston to which "the breach is connected in any suitable manner * * * so that it will participate in the to and fro motion." Browning (1886) showed the rotating breech bolt, and (1895) the rearwardly actuated piston, as did Mason (1894). McClean's invention, therefore, must be appraised as of a secondary, and not as of a primary, character.

At the time of the failure of the McClean arm to pass the Navy test a number of machine guns, notably the Vickers, were in practical use. While McClean's rearwardly actuated piston carrying a rotating breech block was utilized in the Lewis machine gun, it is impossible to say that such was the feature which gave the latter its success. That success was due to its lightness, secured by Lewis' original air-cooling device, and to its general excellence of design. It is difficult to speculate upon the value of a partially developed invention. Without Lewis' subsequent achievement, it is doubtful if McClean's patents would ever have had any commercial value. But the question whether such a sale should be vacated depends upon the facts as they existed at the time it took place. Hoyt v. Latham, 143 U. S. 553, 567, 36 L. Ed. 259.

It is also doubtful whether it was necessary for Lewis to utilize McClean's chief combination, including the rotating breech block, assuming its validity. Lewis says that it was not, and that he has since discarded it in his recent type of arms. It is therefore clear that the con-

sideration—that is to say, the amount of the directors' claims—was at that time full and adequate for the property received. This is so, even in view of the fact that the purchasers knew that Lewis had invented an air-cooling device, and although they had agreed, to join with him in its development as applied to the McClean gun. The ultimate and successful Lewis gun was still a long way in the future. The McClean patent did not control the Lewis invention. The sum at which the purchasers put these patents and their interim advancements into the new company, $50,000, was at that time full value, notwithstanding they received only stock in another speculation. True, they did not advise the other stockholders of their plan to proceed with Lewis. But, inasmuch as that plan required capital, which the stockholders had then recently indicated, by their silence when called upon, an unwillingness to advance, and inasmuch as in no aspect of the facts can it be said that the McClean patents were then worth more than the amount due the directors, it is not thought that this failure to disclose warrants avoiding the sale. The only fact of which concealment should enable the stockholders to undo the transaction would be one affecting their equity in the property.

The instant case is to be distinguished from Geddes v. Anaconda Mining Co., 254 U. S. 590, 41 Sup. Ct. 209, 65 L. Ed. 425, much relied upon by the plaintiffs as a controlling authority, as there the consideration was found by the court to be inadequate. It is concluded that the sale, when subjected to the closest scrutiny, fails to disclose any circumstances that would warrant the court in now setting it aside, or requiring the purchasers to account, as trustees, for profits realized therefrom.

Nonpresentation of claim, and failure to sue Cowles' estate within the time limited by the statutes of California, where he died and where his estate was administered, are set up as a defense by the Guardian Savings Bank & Trust Company, the Ohio trustee of the estate. In the courts of the state of California, apparently, this defense would be good. Lathrop v. Bampton, 31 Cal. 17, 89 Am. Dec. 141; Orcutt v. Gould, 117 Cal. 315, 49 Pac. 188; McGrath v. Carroll, 110 Cal. 79, 42 Pac. 466. But in federal equity jurisdiction these statutes would seem not to be necessarily controlling, if the plaintiffs' claim, as stated in the bill, were sustained. Pomeroy's Equity Jurisprudence, §§ 418, 419, 917, 1080, and 1441. But, inasmuch as this case is disposed of upon the merits, it is not necessary to pass upon this question.

McClean's bill also prays that the defendants be directed to turn over to him 20 per cent. of the stock of the Automatic Arms Company, pursuant to a certain contract which he made with them January 6, 1908. This is in the nature of a separate cause of action, and is found to be without merit, as McClean received 3,000 shares of the stock of the McClean Arms & Ordnance Company in full satisfaction and settlement of that agreement, as shown by his receipt of June 1, 1908.

Upon consideration of the entire case, it seems to be without equity, and therefore the bill is dismissed, with costs.