Argued March 29; affirmed April 25, 1944

RUTHERFORD ET AL. *v.* EDWARD L. EYRE & CO.
ET AL.

(148 P. (2d) 530)

Before Belt, Acting Chief Justice, and Rossman, Kelly, Lusk and Brand, Associate Justices.

*W. C. Winslow,* of Salem, for appellants.

*E. K. Oppenheimer,* of Portland (Custer E. Ross, of Salem, and Wilbur, Beckett, Howell & Oppenheimer, of Portland, on the brief), for respondents.

LUSK, J.

This is an action for conversion in which the plaintiffs have appealed from a judgment of involuntary nonsuit.

The property involved was a quantity of turkeys which the plaintiffs owned up to December 30, 1940, the date of the alleged conversion. On that day the defendant Edward L. Eyre and Co., claiming to exercise rights under two chattel mortgages executed by the plaintiffs, caused the turkeys to be sold at foreclosure. They were purchased by the defendant Northwest Poultry and Dairy Products Co. Whether the court ruled correctly or not in granting the nonsuit depends upon whether the mortgages were still in existence at the time of the sale. The plaintiffs say that they were not; that the indebtedness which they were given to secure had been fully paid; and upon that contention arises the only important question in the case.

In the year 1940 the plaintiffs were engaged in the business of growing turkeys for the market in Marion County, Oregon. The defendant Eyre and Co. is a corporation which deals in grain. Cherry City Milling Company is a corporation engaged in the general feed business in Salem. In 1939 the plaintiffs had purchased a quantity of feed from Cherry City, and, in the spring of 1940, being desirous of continuing such dealings and of obtaining sufficient feed for some 8,000 turkeys during the 1940 season, an arrangement was made under which Cherry City would sell such feed to the plaintiffs on credit and the plaintiffs would execute promissory notes, secured by mortgages on the

turkeys, to evidence the indebtedness thus incurred; Cherry City would obtain grain to process into feed from Eyre and Co., likewise on credit; and in order to secure Eyre and Co. would assign to the latter the notes and mortgages to be executed by the plaintiffs. In accordance with this arrangement the plaintiff executed to Cherry City two mortgages, one in May and the other in June of 1940, each covering 4,000 bronze turkey poults. Each recited that it was given in consideration of the sum of $7,600.00. One was expressed to be given as security for a promissory note for $1,442.00 and other notes to be thereafter executed, and the other a promissory note for $1,470.00 and other notes to be thereafter executed. Aside from the difference in the amounts and dates of the original notes, the mortgages were identical and contained, among other provisions, the following:

> "The above is intended as a mortgage to secure the Cherry City Milling Co., its successors or assigns for the payment of that certain promissory note made by the mortgagors in favor of the mortgagee under date of May 5, 1940, in the principal sum of $1,442.00 and which is due and payable on or before November 8, 1940; also certain promissory notes which will be executed from time to time in favor of Cherry City Milling Co. by the mortgagors; provided, however, that the total principal indebtedness secured by this mortgage shall not exceed the sum of $7,600.00."

At or about the time of the execution of each mortgage the plaintiffs and Cherry City also signed a written agreement (referred to by counsel as the collateral agreements), which, after acknowledging receipt of the note and the mortgage securing it, provided as follows:

"It is understood and agreed that said Cherry City Milling Co. holds the above-described securities as collateral security only and it is contemplated that said Cherry City Milling Co. will make advances from time to time to the said customer of goods, wares and merchandise.

"It is further specifically understood and agreed that the above-described securities are for the purpose of securing payment of such advances and are to be held by the said Cherry City Milling Co. as security for any and all indebtedness now existing or which may hereafter be incurred or in any manner owing from the undersigned customer to the said Cherry City Milling Co. and that said securities secure the payment of such indebtedness and every part thereof, but the same shall be held by the said Cherry City Milling Co. and shall be enforceable between the parties only to the extent of the indebtedness actually owing from the customer to the Cherry City Milling Co.

"It is further understood and agreed that when all indebtedness of every kind and nature owing from the undersigned customer to the Cherry City Milling Co., has been paid in full, such securities will be returned to the customer."

The notes described in the mortgages, together with the mortgages, were thereupon endorsed, assigned and delivered by Cherry City to Eyre and Co., and notes subsequently executed by the plaintiffs as feed was furnished to them, were likewise endorsed and delivered, so that at the time of the alleged conversion Eyre and Co. held all of these certificates in its possession.

The case is no different, so far as any question to be decided is concerned, than if one mortgage containing a limitation of $15,200.00 on the amount of the principal indebtedness secured, together with one col-

lateral agreement, had been executed. Counsel have so treated it and we shall do likewise.

From the date of the execution of the mortgages until December 11, 1940, promissory notes aggregating more than $20,000.00 were executed by the plaintiffs to Cherry City and endorsed and delivered to Eyre and Co., evidencing indebtedness incurred by the plaintiffs for feed furnished by Cherry City to them. Payments were made on the indebtedness through funds secured from the slaughter and sale of turkeys.

On November 1, 1940, the amount of the principal indebtedness was nearly $15,000.00. Between November 1 and December 30 additional promissory notes were executed by the plaintiffs for the purchase price of feed furnished by Cherry City, bringing the total of the indebtedness incurred by the plaintiffs to the above mentioned figure of approximately $20,000.00. On December 2, 1940, some of the turkeys were slaughtered and payment of $9,647.85 was made from the proceeds of their sale. On December 20, 1940, more turkeys were slaughtered and sold for $6,117.84. There is some dispute as to whether the proceeds of this sale were paid to Eyre and Co. before December 30, the date of the alleged conversion, but we deem it unnecessary to determine that question, and for the purposes of the case shall assume that the payment was made before that day. On that assumption the plaintiffs, on December 30, had paid more than $15,200.00, and the balance owing on their notes was in excess of $5,000.00.

During the trial the plaintiffs made an offer of proof, which was rejected by the court, to the effect that on or about October 31, 1940, Cherry City made a count of the turkeys; that, owing, to the negligent

manner in which this was done, many of the turkeys lost weight; that, as a consequence, it became necessary for the plaintiffs to purchase quantities of feed which otherwise would not have been required; and that it was for the purchase price of this additional feed that the notes executed after November 1 were given. This ruling is the subject of one of the assignments of error in the plaintiffs' brief.

LUSK, J.

It is the plaintiffs' position that in view of the recitals in the mortgages that "the total principal indebtedness secured by this mortgage shall not exceed the sum of $7,600.00", the mortgages were extinguished when $15,200.00 had been advanced and paid, and that any further advances were unsecured, notwithstanding that in the end a balance of some $5,000.00 was still owing by them to the holder of their notes. The defendants contend that this balance, being within the limitation, was secured. The plaintiffs offer no explanation of the purpose and effect of the collateral agreements, other than the statement that they were executed in order to make clear the intention that the mortgages were to cover future advances. But, inasmuch as each mortgage recited a consideration of $7,600.00, and that it was intended to secure payment of a definitely described note for a much smaller sum, and "also certain promissory notes *which will be executed from time to time* in favor of Cherry City Milling Co. by the mortgagors", it would seem that the mortgages themselves, without more, sufficiently indicate that future advances were contemplated by the parties. The collateral agreement, therefore, must have had some further purpose and meaning. Of that we shall speak later.

■■ A mortgage to secure future advances is valid. *Backhaus v. Buells,* 43 Or. 558, 571, 72 P. 976, 73 P. 342; *Sabin v. Columbia Fuel Co.,* 25 Or. 15, 24, 34 P. 692, 35 P. 854, 42 Am. St. Rep. 756; *Nicklin v. Betts Spring Co.,* 11 Or. 406, 411, 5 P. 51, 50 Am. Rep. 477; *Hendrix v. Gore,* 8 Or. 406, 409; 1 Jones, Chattel Mortgages (Bowers Ed.) 169, § 94. And the rule as to what indebtedness is secured by such a mortgage is thus stated in 1 Jones, *ibid.,* 171, § 94:

> "If the mortgage shows that the parties intended that it should be a continuing security for all unpaid advances, it will be held to secure the amount of such advances within any specified limit, whenever made, although antecedent advances to that amount may have been made and discharged by payment."

There are many cases illustrating the application of this principle. *In re York,* 30 Fed. Cas. 811, No. 18,138, involved a note and mortgage for $25,000.00 to secure future advances to be used in cultivating a plantation which was covered by the mortgage. The note was payable within one year, and during the year advances made exceeded $53,000.00, and payments exceeded $25,000.00, leaving a balance of more than $27,000.00. The contention that the contract of the mortgagee was fulfilled when advances had been made to the amount of $25,000.00, and that the mortgage was extinguished when the mortgagee had received a like sum from the crops of the plantation, was rejected, and it was held that the mortgage stood as security for the balance up to the amount of the limitation. This conclusion was said to be supported by "the language of the act of mortgage, the character of the instrument, the conduct of the parties to the contract, and the judicial decisions". Reliance was had

upon the analogous case of *Lawrence v. Tucker*, 23 How. (64 U. S.) 14, 16 L. Ed. 474, and, referring to *Pickersgill v. Brown*, 7 La. Ann. 297, it was said that it was therein determined that "a mortgage for advances to be made from time to time, during a definite period, for a specific amount, is a security for the eventual balance in account. That it is not affected by the fluctuations in the account at different periods in the time limited * * *"

In *Weiser Loan & Trust Co. v. Comerford*, 41 Idaho 172, 238 P. 515, there were two mortgages executed by husband and wife, one on chattels, the other on real property, to secure a note for $15,000.00 due two years after date. There was also a written agreement executed by the husband, but not by the wife, which recited, as stated in the opinion:

"That deceased (the husband) was then indebted to plaintiff and would thereafter be borrowing from plaintiff varying amounts on short time notes, and incurring other obligations to it, and that deceased desired to keep plaintiff secured, provided that the amount due on the note for $15,000 should be the sum which deceased was then owing to plaintiff or might thereafter become obligated to pay, whether by renewal notes or new loans, and that if, at any time prior to the release or satisfaction of the mortgages, any indebtedness due plaintiff from deceased were not paid when due, then plaintiff might declare all of the indebtedness owing from deceased immediately due, and that such sums then due or declared due, not exceeding the amount due on said mortgages, should constitute the amount due on the note secured by the mortgages, and that plaintiff might foreclose for such amount."

Because the real property was community property and the wife failed to sign the collateral agreement,

it was held that the real property mortgage was not affected by its terms, but the chattel mortgage was held to be security for a balance owing of $14,000.00, notwithstanding that more than $40,000.00 had been advanced by mortgagee and more than $20,000.00 repaid, the court saying that "where the parties so intend, a mortgage for a specified sum, not expressed to consist of future advances, is thus a continuing security for a floating balance of indebtedness up to the specified amount, even though the total advances may have exceeded that amount and been in part repaid."

Other cases illustrating the application of the rule to which counsel for defendants have called our attention, and which support their construction of the mortgages under consideration, are: *Courier-Journal Job-Printing Co. v. Schaefer-Meyer Brew. Co.,* 101 Fed. 699 (6th Cir.) ; *The Bank of Utica v. Finch,* 3 Barb. Ch. 293, 49 Am. Dec. 175; *Esterly v. Purdy,* 50 How. Pr. 350, 351; *Fassett v. Smith,* 23 N. Y. 252; *Foster v. Reynolds,* 38 Mo. 553; *Glenn v. Seeley,* 25, Tex. Civ. App. 523, 61 S. W. 959; *Lawrence v. Tucker,* supra; *Shores v. Doherty,* 65 Wis. 153, 26 N. W. 577, 578, 579; *Russell v. Davey,* 7 Grant's Ch. 13, 15. See also, *Douglass v. Reynolds,* 32 U. S. 113, 8 L. Ed. 626.

The result of the decisions is well summed up in the following language of Circuit Judge (later Mr. Justice) Lurton in *Courier-Journal Job-Printing Co. v. Schaefer-Meyer Brew. Co.,* supra, p. 704.

"Mortgages to secure future advances, or future liability as surety, are not unusual, and have been sustained in many cases. They constitute a continuing security for the time and to the amount fixed. When a particular advance or liability

is incurred and paid off, wholly or in part, the mortgage, if so intended, will continue as a security for new advances or new liabilities made within the limit fixed."

It is not necessary to determine what the rights of the parties would be if the mortgages stood alone, unaided by the collateral agreements. Taken together, we think there can be no doubt as to what the parties intended.

■■ Each mortgage and accompanying collateral agreement having been executed between the same parties at the same time and with reference to the same subject matter, they should be construed together as constituting but a single instrument: *Hattrem v. Salmon River Improvement District,* 132 Or. 297, 304, 285 P. 231. This, we understand from the briefs of counsel, to be conceded, although some point is sought to be made by the plaintiffs of the fact that the collateral agreements were not formally assigned to Eyre and Co. But this, of course, was not essential; the mortgages were but incidents to the notes, and endorsement and delivery of the notes carried the mortgages with them (*Holt v. Guaranty & Loan Co.,* 136 Or. 272, 282, 296 P. 852), and necessarily, also, the collateral agreements, as an integral part of those instruments.

■ Reading them together then (and for the moment as though they were but a single mortgage), we find that the parties agreed that Cherry City was to hold "the above-described securities as collateral security only and it is contemplated that said Cherry City Milling Co., will make advances from time to time to the said customer of goods, wares and merchandise"; that the securities are "for the purpose of securing payment of such advances and are to be held by the Cherry

City Milling Co. *as security for any and all indebtedness now existing or which may hereafter be incurred or in any manner owing* from the undersigned customer to the said Cherry City Milling Co., and that said securities secure payment of such indebtedness and every part thereof''; and that *"when all indebtedness of every kind and nature owing* from the undersigned customer to the Cherry City Milling Co. has been paid in full such securities will be returned to the customer''; but that the ''total principal indebtedness secured by this mortgage shall not exceed the sum of $15,200.00.'' To say that an indebtedness incurred by the plaintiffs for goods, wares and merchandise, and still unpaid, is not secured by the mortgage, although within the limitation fixed, would be, it seems to us, to contradict the writing itself, for it would be equivalent to an assertion that a part of the indebtedness was not secured when the parties had solemnly agreed that the mortgage should stand as ''security for any and all indebtedness now existing or which may hereafter be incurred''. On the other hand, to hold that, notwithstanding the debt limitation may have been passed at some time during the course of the dealings between the parties, any balance within the limitation that may finally remain unpaid is secured by the mortgage, is to give effect to every part of the instrument, to carry out the evident intent and purpose of the parties according to ''the very nature of such negotiations'' (*Douglas v. Reynolds,* supra), and to construe the writing in conformity to judicial opinion in every analogous case which has come to our attention. The parties must have intended to accomplish something through the collateral agreements. As we have seen, they were not executed for the mere purpose of show-

ing (what sufficiently appeared from the mortgages themselves) that future advances were contemplated. The mortgages themselves were likewise all that were needed if the plaintiffs' view of the extent of the security is the correct one. Unless, therefore, we place upon the collateral agreements, read with the mortgages, the construction indicated, we discard the collateral agreements and leave them without purpose or effect—a result which would conflict with a cardinal principal of the construction of contracts.

■ It is contended, however, by counsel for the plaintiffs that in some, at least, of the cases relied on by the defendants the point was decided, not as one of law, but as a question of fact. The rule is said to be that where a mortgage contains an agreement that it shall cover future advances it will secure only those advances which were within the contemplation of the parties at the time the mortgage was executed (citing 11 C. J., Chattel Mortgages, 495, § 158; 14 C. J. S., Chattel Mortgages, 722, § 110; Jones, *ibid.*, 174, § 98, and decisions to be later noticed) and it is argued, by implication at least, that it was competent to show that the plaintiffs and Cherry City agreed at the time the mortgages were executed that $15,200.00 worth of feed was all that would be needed to meet the plaintiffs' requirements, but that an unexpected event occurred, namely, the negligent acts of Cherry City referred to in the statement, which, operating as an "intervening cause", made necessary future advances to the extent of more than $5,000.00 worth of feed, which were not in view of the parties at the inception of the transaction and therefore not secured. It is true that counsel for the plaintiff concedes the applicability of the parol evidence rule and disclaims any intention to run afoul

of it, but he does say that "what the parties contemplated was that they should feed these turkeys through a normal feeding period under normal circumstances"; and, as the writings are silent upon this point, it is difficult to perceive how it could be established, save by the introduction of oral testimony.

■ We think it too clear for argument that the mortgages are governed by the parol evidence rule: *Willamette Production Credit Ass'n. v. Day,* 167 Or. 451, 118 P. (2d) 1058. The parties put their entire agreement in writing, and its meaning must be ascertained by the court, as in the case of any other written contract. Notwithstanding the estimates and expectations of the parties, their rights and liabilities are fixed by the terms of their written agreement. That being so, the evidence stated in the rejected offer of proof could not be relevant in any view of the case. If the agreement means what the plaintiffs say it means, then the security was extinguished when $15,200.00 was borrowed and repaid and the circumstances which made further advances necessary are immaterial. If, on the other hand, the defendants' construction of the agreement is the correct one, then the proffered evidence would be admissible only because it should be shown by parol evidence that the parties contemplated that the security of the mortgages should extend only to advances made "through a normal feeding period under normal circumstances". Evidence of that character could not be admitted without violating the parol evidence rule.

■ The assertion that some of the cases relied on by the defendants decided the question of intention as one of fact, rather than of law, is not borne out by a reading of the opinions. The view that such a question

should be left to the decision of the jury is untenable and fundamentally fallacious, for it would result, if adopted, in surrendering to the jury the court's function of construing written instruments: §§ 2-216, 5-305, O. C. L. A. Questions of fact may, of course, arise in cases of this character. There may be an issue as to the amount advanced, as to whether it was advanced in fulfillment of the purposes of the agreement or, when the purpose has not been expressed in writing and must be shown by parol evidence, it may become necessary to ascertain as a fact the terms of the agreement. See, *Esterly v. Purdy,* supra; *Foster v. Reynolds,* supra; *Glenn v. Seeley,* supra. Once ascertained, however, their legal effect is for the court. It is one thing to determine by a construction of a written agreement what the parties to it intended, and quite another to ascertain whether what they have done has been in pursuance of the agreement. The difference is illustrated by *Backhaus v. Buells,* supra, one of the cases upon which the plaintiffs rely. In that case there was a chattel mortgage on hops to secure future advances. An agent of the mortgagee loaned a sum of money to the mortgagor on his own account, and the mortgagee attempted to ratify the loan and to bring it within the security of the mortgage. But the court held:

> "The contract having been entered into to secure future advances to be made by Backhaus (the mortgagee), he could not take an assignment of any debts that Buells (the mortgagor) owed, and tack them to his mortgage, so as to make them a lien upon the property, without some stipulation to that effect". (43 Or. 571).

In this case the advances were agreed to be of goods, wares and merchandise; and goods, wares and

merchandise were furnished accordingly. Had the advances actually been made for some other purpose, foreign to that agreed upon, they would not have been secured, and it would have been competent for the plaintiffs to have made proof of the facts. But that is a wholly different thing than attempting to show an oral agreement, made prior to the execution of the mortgage, which varies its terms.

Another case cited by the plaintiffs is *Wright v. Voorhees,* 131 Iowa, 408, 108 N. W. 758, 117 Am. St. Rep. 429, 9 Ann. Cas. 1149. The case deals with a mortgage on two horses given to secure two notes, for definite sums, and for further advances. It was found that one of the notes was intended to secure future advances. The full amount of both notes was paid, but the mortgagee claimed that subsequently he made other advances for which he recovered a judgment, and that these advances were likewise secured by the mortgage. The court held that they were not in the contemplation of the parties at the time of the execution of the mortgage because they "were not in connection with the subject matter of the mortgage". It appeared that successive accounts between the mortgagor and mortgagee had been settled by the giving of notes secured by other mortgages than the one involved, and the judgment which the mortgagee claimed was covered by the mortgage in suit was incurred after these successive accounts had been thus fully settled. It will be observed that this case does not present the question of the effect of a limitation on the amount of a secured indebtedness, but, rather, like *Backhaus v. Buells,* supra, determines only that an indebtedness which has no reference to the subject matter of the mortgage is not covered by it. As the court pointed out in its opin-

ion, the conduct of the parties clearly showed that it was never intended that the items of indebtedness involved were intended to be secured by the mortgage. Obviously the facts here are different. All the advances were of the same character, were treated by the parties in the same way, and were for the purpose stated in the mortgage.

In *Bondurant v. Tally's Trustee,* 191 Ky. 202, 229 S. W. 377, another case cited by the plaintiffs, a note was given for $4,000.00 secured by a mortgage for future advances on the mortgagee's mules, implements and machinery, used by him in certain levee construction work. The mortgagor was a subcontractor under the mortgagee, and the advances were to enable him to pay his hands, purchase supplies, etc. Subsequently, it becoming apparent that $4,000.00 would not be sufficient for these purposes, another note for $2,000.00 was given together with a second mortgage on the same chattels. The mortgagee advanced a total of $9,000.00, of which $6,000.00 was paid by crediting on the notes amounts earned by the mortgagor during the progress of the work. The question arose whether the balance of $3,000.00 was secured by the mortgages. The court held that it was not so secured, that the mortgages did not "in terms or by implication secure him (the mortgagee) in any and all advancements he might have made Tally until the latter's work for him was completed", and that "by their express statements the only security they afford is limited and confined to the two notes of $4,000 and $2,000 named therein". It would seem that nothing further need be said to show the wide difference between the facts of that case and the one at bar.

The plaintiffs also cite the recent case of *Willamette Production Credit Assoc. v. Day,* supra, but it is not apparent how that decision aids them. It holds that where a mortgage on crops, given to secure future advances, contained a limitation on the sum which the mortgagee would advance, the mortgagors would not be permitted to show by parol that there was an oral agreement to advance a sum, indefinite in amount, sufficient to cultivate and harvest the mortgagors' 1938 hop crop. We held that the terms of the mortgage, which were unambiguous, as are the terms of the mortgages in the case at bar, could not be varied or contradicted by parol; but otherwise, we think, the decision is without bearing on the question here presented.

■ No other cases bearing on the construction to be given the mortgages have been cited by counsel for the plaintiffs save by a general reference to decisions listed in the notes to the articles on chattel mortgages in 11 C. J. 495 and 14 C. J. S. 722. We find nothing in these cases which conflicts with the views which we have expressed to the effect that the unpaid balance on the notes executed by the plaintiffs was secured by the mortgages. The indebtedness was delinquent on December 30, 1940, and the defendants were not guilty of conversion, but had the legal right to foreclose.

■ As an additional ground of reversal, the plaintiffs urge that the defendants are, in any event, liable for the difference between the market value of the turkeys sold on foreclosure, $3,850.00, and the price realized, $2,502.80. Defendants say that this is a collateral attack on the foreclosure, which will not be permitted, but we find it unnecessary to pass on that question. See *Exchange State Bank v. Occident Elevator Co.,* 95 Mont. 78, 24 P. (2d) 126, 90 A. L. R. 740. The

mortgages provide that in the event of default "it shall be lawful for such person (the mortgagee), his agents, or assigns to take immediate possession of said property and sell the same at public or private sale". The defendants elected to sell the turkeys at private sale, and did so after notifying the plaintiffs in writing of the time and place of the sale. One of the plaintiffs attended the sale. There is no evidence of any fraud or that the sale was not fairly conducted. It was competent for the parties to provide the manner in which the mortgage should be foreclosed, and the sale was lawful: § 68-209, O. C. L. A. Under these circumstances the defendants are not required to account for the difference between the market value of the mortgaged property and the price received for it: *Credit Service Co. v. Furney,* 128 Or. 21, 26, 27, 271 P. 738. And see, *Liquidators v. Benedict,* 153 Or. 492, 498, 56 P. (2d) 1090.

It follows from the foregoing that the court was right in rejecting the plaintiffs' offer of proof and correctly ruled that the defendants were entitled to a nonsuit.

The judgment is, therefore, affirmed.