Argued April 8, affirmed December 3, 1952

# GLASER ET AL v. SLATE CONSTRUCTION CO. and PACIFIC GENERAL CONTRACTORS

251 P. 2d 441

*W. C. Winslow,* of Salem, argued the cause for plaintiffs-respondents, and defendant-respondent Pacific General Contractors, Inc., an Oregon corporation. With him on the brief was Norman K. Winslow, of Salem.

628

*Sam Kyle,* of Albany, argued the cause for defendant-appellant. With him on the briefs were Weatherford & Thompson, of Albany.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and TOOZE, Justices.

LUSK, J.

This is a suit to foreclose a chattel mortgage commenced by F. (Frank) T. Glaser, William Glaser, D. (David) E. Turnidge, and P. (Percy) L. Turnidge. The defendant, Slate Construction Company, counterclaimed to recover from the plaintiffs the reasonable rental value of certain personal property. At the conclusion of the trial the court entered a decree of foreclosure and dismissed the counterclaim. Slate Construction Company, hereinafter referred to as the defendant, appeals.

There is no controversy here about the validity of the mortgage or plaintiffs' right to foreclose, other than that the defendant contends that the balance owing on the mortgage has been more than fully paid by the amount claimed for rental of the personal property.

The mortgage, covering various pieces of road construction equipment, was executed under date of November 17, 1947, by the defendant in favor of the United States National Bank of Portland, Oregon, to secure a loan in the sum of $67,804.68. It was assigned by the bank to Investment Service Company, a corporation, which in turn assigned it to the plaintiffs, who were at the time stockholders in Pacific General Contractors, a corporation, hereinafter called Pacific. The last named corporation was the plaintiff in the case of *Pacific General Contractors v. Slate Construction*

*Company,* this day decided, and which will hereinafter be referred to occasionally as the first case.

The articles of personal property involved in the counterclaim are likewise pieces of road construction equipment. They are described as two DW-10's with scrapers attached, one D-8 Caterpiller tractor (sometimes referred to in the testimony as RD-8), and a Chevrolet flat bed truck and mounted fuel tank. (These are different machines than those covered by the mortgage.) The counterclaim alleges that while the defendant was the owner thereof the plaintiffs "had and received and leased the above personal property and agreed to pay the said defendant the reasonable value of the rental thereof". The particular periods of time during which plaintiffs leased each piece of equipment, together with the reasonable rental value thereof, are alleged. It is further alleged:

"* * * that the plaintiffs agreed to pay said rent within a reasonable time and that a reasonable time has elapsed at the time of the filing of the amended complaint herein and that all of said rent is now due and owing from plaintiffs to the said defendant.

"VI.

"That it will be necessary to have an accounting to determine the exact amount due the said defendant from the plaintiffs for the rental of said equipment".

A decree is sought "determining by accounting the amounts due from the plaintiffs to the defendant, and for a decree in favor of the defendant and against the plaintiffs for the sum found due less the amount due the plaintiffs on the note set forth in plaintiffs' complaint, and for a decree that the said note and mortgage mentioned in plaintiffs' complaint has been paid in full".

We are met at the outset with the objection that the facts pleaded do not constitute a counterclaim under the statute. The counterclaim is a part of the amended answer. The initial answer contained a counterclaim in all respects identical except that it said nothing of the necessity of an accounting and asked for a judgment in the sum of $127,780.17 with interest at the rate of six per cent per annum from May 2, 1950. The amendment was made without objection on the trial, after counsel for the plaintiffs had objected to the admission of evidence in support of the counterclaim on the ground that it did not state facts sufficient to constitute a counterclaim in equity and before the court had ruled on the objection. This objection was reiterated after the amendment had been allowed. Plaintiffs have argued the point in their brief in this court. Their counsel likewise referred to it on the oral argument. In the course of his discussion of the subject he said, in answer to a question from the bench as to whether he had any objection to the case being tried by the trial judge:

"No, he finally went ahead and entertained jurisdiction and tried it out, and decided it on the merits as far as that's concerned. And we had no objection to that. We don't make any objection to this court doing the same thing."

The governing statute is § 9-114, OCLA:

"The counterclaim of the defendant shall be one upon which a suit might be maintained by the defendant against the plaintiff in the suit; and in addition to the cases specified in the subdivisions of section 1-712, it is sufficient if it be connected with the subject of the suit."

■■ We have repeatedly held that under this statute the counterclaim on which a defendant may have affirmative relief in an equity suit must contain matters

of equitable cognizance. *Wiggins v. Hendrickson,* 191 Or 285, 287, 229 P2d 652, and cases there cited. It is unnecessary to cite authority for the view that a pleading which seeks to recover the reasonable rental value of personal property does not state a cause of suit in equity but a pure legal claim, and therefore cannot constitute a counterclaim to foreclose a mortgage. *Hanna v. Hope,* 86 Or 303, 310, 168 P 618. The character of the pleading is not changed by alleging the necessity for an accounting when the facts stated demonstrate that no accounting is needed or would be involved. A jury is entirely competent to determine from the evidence whether a piece of equipment was rented (as is claimed in this case, under an implied agreement) ; if so, for how long; what was the reasonable rental value by the day or month; and to make the necessary calculation in order to figure the amount owing.

█ The defect, however, is one which can be waived by failure to demur and filing a reply *(Hanna v. Hope,* supra; *Templeton v. Cook,* 69 Or 313, 317, 138 P 230), though even in the absence of a demurrer it can be taken advantage of by objection to the introduction of any testimony offered to sustain it. *McCargar v. Wiley,* 112 Or 215, 227, 229 P 665; *Eagle Point v. Hanscom,* 121 Or 40, 44, 252 P 399; *Kondo v. Aylsworth,* 81 Or 225, 228, 158 P 946. This court has held in *Maxwell v. Frazier,* 52 Or 183, 96 P 548, 18 LRA NS 102, that where there is an entire lack of matter of equitable cognizance the objection is not waived by failure to interpose it at the proper time, but it is available at any stage of the proceeding, a distinction being made between that kind of a case and a case which falls within the field of equitable jurisdiction but in which an element essential to complete jurisdiction is lack-

ing. See, also, *Carroll v. McLaren,* 60 Or 233, 235, 118 P 1034; *Bowsman v. Anderson,* 62 Or 431, 436, 123 P 1092, 125 P 270. We are not disposed to extend the doctrine of those cases, however, to counterclaims, and we are of the opinion that in a suit in equity, where the defendant files a counterclaim which states a purely legal claim and one which does not come within the field of equitable jurisdiction, the objection may be waived. See, in this connection, *Ingersoll v. Clapp,* 179 Wash 335, 37 P2d 895. In the present case, while counsel for the plaintiff did, it is true, object to the introduction of evidence in support of the counterclaim, nevertheless in this court the statement made by him in argument which we have quoted amounted to an express waiver of the point, an invitation in fact to the court to take jurisdiction of the matters embraced in the counterclaim. We therefore conceive it to be our duty to determine the issue, trying the case de novo as a suit in equity.

The controversy comes as an aftermath of the case of *Pacific General Contractors v. Slate Construction Company.* The transcript of testimony in that case, the exhibits and the pleadings, as well as the brief of Pacific General Contractors filed in this court, were all received in evidence in the present case without objection. As the record in the first case consists of nearly 800 pages of testimony and some 60 exhibits —much of this without bearing on the issues now before us—this procedure has added to the difficulty of determining a controversy already sufficiently involved.

It is conceded in the testimony that during the year 1949 the plaintiffs obtained possession of and used the two DW-10's and the D-8. It is also conceded that one of the plaintiffs, Percy Turnidge, took pos-

session of the Chevrolet flat bed truck and mounted fuel tank; but it is contended that he did so in his capacity as president of Pacific and not as an individual. The defendant urges a two-pronged theory of recovery. First, that the equipment belonged to it, and that the plaintiffs are liable to it for its reasonable rental value under the law of quasi-contract; second, that, even though the equipment was the property of Pacific, still plaintiffs are liable because the equipment was used in the prosecution by the two corporations of a joint adventure in the building of a highway known as the North Umpqua Project, and that plaintiffs, as directors of Pacific, violated a fiduciary duty to the joint adventure and to the defendant by taking possession of the equipment and using it.

We will consider first the question of ownership of the two DW-10's and the D-8. From the standpoint of the money involved they are the most important, for the evidence tends to show that their rental value is very substantial. For reasons to be stated, the question of ownership of the Chevrolet truck and fuel tank need not be determined.

■ We may preface the discussion by stating that, while the ownership of the DW-10's and the D-8 was involved in the first case and apparently was passed on by the circuit court in that case, the decision there is not controlling here because the parties are different. It should also be remembered that, while we were not at liberty to do more in the first case than to determine whether there was substantial evidence to support the judgment here our function is to weigh the evidence and to exercise an independent judgment on the facts.

As appears from our opinion in the first case, the four plaintiffs in this case, farmers living in the vicin-

ity of Albany, Linn County, Oregon, acting upon the persuasion or importunities of Mr. M. C. Slate, president of Slate Construction Company, in the spring of 1948 undertook to engage in the business of highway construction. Before that one of the plaintiffs, Frank Glaser, had invested $10,000.00 in the stock of Slate Construction Company and later loaned the company $5,000.00; and another of the plaintiffs, William Glaser, had invested $10,000.00 in such stock, and later loaned the company $10,000.00. On May 12, 1948, the plaintiffs, together with Slate, George Fritz and Webber Doughton the latter two directors of Slate Construction Company, organized Pacific General Contractors for the purpose of engaging in the highway construction business. The plaintiffs, Slate, Doughton and Fritz, became directors of the new corporation.

About this time Slate learned of an opportunity to bid on the North Umpqua job. The details of the evidence concerning the submission of this bid and the ultimate award of the contract to Slate Construction Company need not be stated. It is sufficient to say that Slate Construction Company had ample equipment for carrying out the North Umpqua contract as well as another contract referred to as the Estacada job, which was already well under way, but that it was not adequately financed; while, on the other hand, Pacific was well financed, but had no equipment. On May 25, 1948, after the bid on the North Umpqua job had been accepted but before the contract was executed, a meeting of the board of directors of Pacific was held at which the following motions were carried:

"Motion made by D. E. Turnidge and seconded by Wm. F. Glaser to authorize the treasurer of P.G.C. to use the money deposited in the First

National Bank of Portland, Albany Branch approximately $30,000 for carrying on work on the two present projects."

"Motion by Mr. Geo. Fritz and seconded by M. C. Slate to authorize the P.G.C. Inc. to purchase one Byers ¾ yd, combustion shovel and dragline, two W.D.10's; one 1½-2 ton flat bed International truck and other machinery totaling approximately $50,000, from the Slate Construction Co."

We have set out these motions not as originally recorded by Webber P. Doughton, secretary-treasurer of Pacific, but as rewritten by him from his pencilled notes after the meeting. A subsequent correction of the motion regarding the use of $30,000.00 is not material to the question we are now considering.

Slate Construction Company had purchased the two DW-10's from Interstate Tractor Company. A balance of between $7,000.00 and $8,000.00 was owing on the contract and the seller was pressing for payment. Acting under Slate's instructions, Doughton attended to the details of the purchase of these machines by Pacific. A loan of $16,802.40 was obtained from the First National Bank of Portland, secured by a mortgage on the two DW-10's and the D-8 (which was acquired at about the same time, as hereinafter related). The note and mortgage, both dated August 4, 1948, were signed by Doughton as secretary-treasurer of Pacific. After paying Interstate Tractor Company the amount due it, a balance of $7,834.67 from the proceeds of the loan remained, which was deposited to the credit of Pacific on August 5, 1948. On the same day a check on Pacific for $7,800.00 in favor of Slate Construction Company was drawn by Slate as president and Doughton as secretary of Pacific and delivered to Slate Construction Company.

There is in evidence a copy of a certificate signed by Doughton, as secretary, and P. L. Turnidge, as

director, of Pacific, dated July 30, 1948, which recites that at a meeting of the board of directors of Pacific, held on May 25, 1948, a resolution was adopted authorizing any one of the following persons: M. C. Slate, president, George Fritz, vice president, Webber P. Doughton, secretary-treasurer, and P. L. Turnidge, director, to borrow from the First National Bank of Portland, Oregon, a sum or sums of money not exceeding at any one time the aggregate amount of $50,000.00, and to mortgage the property of the company to secure such indebtedness. This certificate was delivered to the bank. The minutes of the meeting of May 25, 1948, fail to disclose that any such resolution was then adopted. Neither does it appear in the minutes that either Slate or Doughton, or any other officer or director, was authorized to exercise the authority granted on May 25 to purchase equipment from Slate Construction Company, and there is no evidence that any corporate action was ever taken fixing the purchase price of any particular piece of machinery referred to in the motion. The evidence indicates that, in the first instance, Slate, as president of Slate Construction Company, fixed the price at which the DW-10's should be sold and, as president of Pacific, agreed to pay that price.

Under these facts it was contended by counsel for Pacific in the first case that Slate and Doughton acted without authority, the transaction was a nullity, and Pacific was entitled to restitution of the sum of $7,800.00 paid to Slate Construction Company for the latter's interest in the DW-10's. Apparently the contention prevailed in that case. On the theory that it did, as appears from our opinion on the motion to dismiss the appeal in the first case, counsel for defendant in this case offered in evidence the judgment

and record in the first case for the purpose of proving, among other things, that Slate Construction Company never parted with its ownership of the DW-10's. As we have held, the evidence was not admissible for that purpose.

It is apparent that the defendant has reversed its position on the question of the ownership of this equipment. We think that it was right the first time. We may assume, as Pacific's counsel argued in the first case, that the motion of May 25, 1948, did not authorize Slate or Doughton to agree upon the terms of the purchase of the DW-10's or to mortgage the property. But that does not finally determine the question, for it remains to be considered whether Pacific ratified their acts.

It is shown by the testimony of Dave Turnidge that sometime in the latter part of August, 1948, he became aware that Slate Construction Company was claiming that Pacific owned the DW-10's and other equipment. Dave Turnidge was questioned concerning testimony given by Slate to the effect that the sale price of the DW-10's was based upon an appraisal of the equipment made by the plaintiffs. It developed that the so-called appraisal occurred in the forepart of September, 1948, shortly after a meeting of the board of directors of Pacific held September 1, and, of course, a considerable length of time after the alleged sale; and that it was decided upon as the result of disclosures made at that meeting. Concerning these matters the plaintiff, Dave Turnidge, testified in the first case:

"Q He [Slate] said you boys went out and made an appraisal of some machinery.

"A At our meeting of September we found out we were supposed to own this stuff, and we began to wonder where we did stand, and we owned some equipment we didn't know anything about, and we

had never seen, and they were operating in our name, and we had a mortgage due with payments behind on it, and so we said, 'Let's go out and see what Slate Construction Co. consists of; if we are going to have such a deal as this, let's go out and see what we got', and the whole bunch agreed to that, and we went out to look at it, and without an appraisal Mr. Doughton wrote down what he thought it was worth. He did all the bookkeeping; none of us knew the condition of the stuff. We just glanced at it. We weren't capable of making any appraisal.''

Again, Dave Turnidge, testifying in the present case, when asked whether he and his associates made an appraisal of the equipment in question, answered:

"Well, no, we didn't make an appraisal of it. We wanted to see what kind of equipment we did have. We was buying equipment; we didn't know what it was; we thought we'd go and look at it and there was no appraisal made of it.''

The minutes of the meeting of September 1, which was attended by all the directors except Slate, and at which George Fritz, vice president of the company, acted as chairman, show that the following motion was passed:

"Motion was made by F. T. Glaser and second [sic] by Wm. Glaser that 'a buying and selling committee' be formed so that no member of the company be able to purchase anything costing more than $1000 without committee approval or board authorization. Motion carried.

"The committee appointed by V. Fritz was P. L. Turnidge, Webber Doughton and D. E. Turnidge.''

■ In *Currie v. Bowman,* 25 Or 364, 377, 35 P 848, the court quoted as follows from the case of *Kelsey v. National Bank of Crawford Co.,* 69 Pa St 429:

"The law is well settled that a principal who neglects promptly to disavow an act of his agent

by which the latter has transcended his authority makes that act his own; and the maxim which makes ratification equivalent to a precedent authority, is as much predicable of ratification by a corporation as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent.''

The foregoing is a well-established rule which is supported by additional authorities cited in *Currie v. Bowman* and is restated and applied in the following subsequent decisions of this court: *Depot Realty Syndicate v. Enterprise Brewing Co.,* 87 Or 560, 575, 576, 170 P 294, 171 P 223; *In re Wilson's Estate,* 85 Or 604, 619, 167 P 580; *Finnegan v. Pacific Vinegar Company,* 26 Or 152, 154, 37 P 457. See, also, *Friend Lumber Company v. Armstrong Building Finish Company,* 276 Mass 361, 177 NE 794, 80 ALR 599; 13 Am Jur 936, Corporations, § 984. It should be observed, as held in *Depot Realty Syndicate v. Enterprise Brewing Co.,* supra, that this doctrine is not necessarily based upon an estoppel *in pais,* but that ratification may be complete without any elements of estoppel.

■ The testimony of Dave Turnidge given in the first case, when Pacific was contending that it had never acquired title to the DW-10's, was adverse to Pacific's interest and there is no reason for rejecting it. It shows that at the meeting of September 1, 1948, the directors of Pacific were apprised of the purchase of this equipment and of the mortgage covering it and the D-8 given to the First National Bank of Portland. There is no testimony that the details of the transaction were discussed, but it is a fair inference that they were. Doughton, who knew all about it, was present, and, of course, the directors had access to the corporation's bank deposit book, its bank statements and its canceled checks. The board did not repudiate the transaction.

Instead, it passed a resolution for the purpose of safe-guarding the corporation against similar transactions in the future which might be undertaken without the knowledge of the board or of its "buying and selling committee"; and the members of the board, including the plaintiffs, proceeded to examine the equipment for the purpose of ascertaining its value as property of the corporation. Further, as will hereinafter appear, when faced with foreclosure of the mortgage, the corporation did not question its validity but treated the matter as would anyone whose own property was involved. It was not until the trial of the first case in August, 1949, that Pacific asserted the claim that it did not own the equipment covered by the mortgage to the First National Bank of Portland. Even in that case Pacific seems to have at first claimed the right to recover from Slate Construction Company moneys earned by renting the DW-10's, though subsequently it abandoned that position—no doubt because it could not expect to hold to it and at the same time seek restitution from Slate Construction Company of the purchase price of the equipment. We think the conduct of the corporation clearly amounted to ratification by acquiescense. The DW-10's were the property, not of Slate Construction Company, but of Pacific, and Pacific continued to own them until the mortgage on them was foreclosed, as hereinafter related.

■ What has been said respecting the DW-10's applies also to the D-8; but here the question of ownership is affected by the fact that of the total purchase price of $10,000.00 the sum of $6,500.00 was paid by defendant and only $3,500.00 by Pacific. The machine was bought from Southeast Equipment Company and a bill of sale for it issued to Pacific. These facts are not disputed. There is nothing to show an intention on the part of

either party that the interest of each in the property was to be other than what the respective amounts of their contributions to the purchase price would indicate. We hold, therefore, that Pacific and defendant were owners in common of the D-8, the former having a 35/100 interest, and the latter a 65/100 interest, in it.

It still remains to be determined, however, whether the defendant had any interest in the D-8 during the period that it was in possession of the plaintiffs.

The evidence shows that late in December, 1949, the First National Bank of Portland, mortgagee in the mortgage executed by Pacific and covering the D-8 and the DW-10's, notified Pacific that the mortgage was in default and that Pacific would be allowed ten days in which to pay the indebtedness. Receipt of this letter was testified to by Doughton.

In the first case Dave Turnidge testified to the same fact and to what subsequently occurred as follows:

"A We got a letter just exactly like the letter Webber [Doughton] referred to some time ago. Ruth [Mrs. Snoderly, secretary of defendant] sent it to Percy and Percy sent it to us and we asked the attorney what to do about it. He said we would have to have a meeting and present it to the Pacific General Contractors and see whether or not we wanted to do that; and we did, and after we had the meeting that night, they said they would let us know, and Mr. Slate and Mr. Fritz and Mr. Doughton said, 'No, we are not in a position where we will go ahead and redeem that mortgage.' He said, 'We will let it go.'

"Q Were there minutes of that meeeting?

"A We had the meeting but I don't know whether there were minutes or not; we were all there.

"Q When was it?

"A It was two days before the mortgage was due whenever they took possession of it. It was

two days prior to that, because we had two days to get the answer in whether we were going to redeem it or not. After the meeting was over, Frank Glaser and Bill Glaser and Percy Turnidge and myself stood out there and wondered what we should do about it. The bank told us they were going to sue on account of the fact we were going to subscribe on the stock. We didn't know anything about it until the bank told us about it.

"MR. SPAULDING: You are speaking of the mortgage on that particular equipment that had been given to the bank, and signed Pacific General Contractors by Mr. Slate and Mr. Doughton.

"MR. WINSLOW: I don't think Slate is on it.

"A Anyway, they had a mortgage against the Pacific General Contractors for $15,000.00, or whatever it is. I said, 'I don't know what all the holler is about; the equipment is worth the money. The bank said, "If it isn't, we will put it up, and we got a chance to come back on you fellows" '; and we decided the equipment was worth it, and the Glasers and Percy and I bought it from the bank and redeemed it from the bank. We gave the bank the check for it.

"Q That was to redeem it as a result of this mortgage from Pacific General Contractors?

"A That's right. After this had been turned down in the meeting, it wasn't for Pacific General Contractors. We bought it as individuals, not as Pacific General Contractors. The bank agreed to make us a bill of sale and send it to the four of us, and that night - - -

"MR. SPAULDING: Can you tell us what the date of that was now?

"A Last year, 1949.

"Q Early in the year?

"A Didn't she give you the date of February we took possession of it?

"Q Wasn't it about February 1, 1949?

"A That was March 12th, wasn't it? I believe he said he would give us until March 12th to redeem it. I can't remember that, but anyway the bank never sent the bill of sale for that stuff, and I kept after them for it, and here the other day they said there was something about—they had to have something—they slipped up on something. They said, 'We will go ahead and foreclose it in you fellows' names, or we will go and take the equipment back and go through the whole process again.' I talked to the boys about it and they said, 'If they want the equipment back, that's the best way out of it.' And they came and got the equipment, and it is down there now.

"Q You took possession of the equipment on the basis you mentioned, which was the D 8 Cat and two DW 10's?

"A That's right.

"Q And in either February or March of 1949?

"A That's right, but I didn't take possession of it, but we owned it. It set out here on the lot for a long time.

"Q You put it where it was and left it there?

"A No, we didn't; the bank put it there."

In the instant case Dave Turnidge testified as follows concerning this transaction:

"Q * * * What I want to show is you actually took this property over from the First National. I believe the testimony shows that.

"A I don't know. He brought it up here and we never moved it until way along in the fall. We immediately put it up for sale to get our money out of it. That's what we were trying to do with it. We just brought it there and tried to sell it.

* * * * *

"A We bought it from the First National Bank on the date of that check and had owned it ever

since, and had it out here for sale. Mr. Cooper thought he could sell it immediately, but he wasn't able to, so it set there, and when we couldn't sell it, why we got together, the four of us, and decided to see if we could use it or rent it or do something with it.

\* \* \* \* \*

"Q Who made up this fund of $13,000?

"A Well, the four of us paid according to the amount of subscription that we had subscribed to, I believe.

"Q Who do you mean, 'the four of us'?

"A The Glaser boys and myself, we defendants.

"Q You turned the cat back or all this property back to the First National Bank, as you testified in your former testimony?

"A They offered us our money back, and we sold it back to them.

"Q They couldn't give you a good title?

"A They didn't say that.

"Q What did they say?

"A They said, if I wanted to go ahead and take that property that they would take it and foreclose, that they hadn't advertised it, or something like that, and there might be a technicality there, that they were foreclosing that property, and we would pay the forclosure proceedings and they would allow us to have it back when we were through or they would refund us our money and they would foreclose it and we would be completely exonerated from all of the deal and we would have no more liabilities or further use of it or anything else.

"Q Your money was refunded to you?

"A Some, quite a long time after that that they sent me a check.

"Q When was that?

"A Well, they come and got the equipment— I think it was probably December, I wouldn't know.

I know I called them and told them that the equipment was sitting there.

"Q December, what year?

"A That would be 1949, wouldn't it. I believe it was 1949.

"Q It never was foreclosed at all until after May of 1950, was it?

"A That I had nothing to do with. I don't know anything about what they did. They notified us that it had been held the proper number of days and that it was now going to be sold either at a private sale or public sale, whichever they chose. That was some time about the time that this check was written because we went and bought it at that time. They told us what it would take to buy it at a private sale.

"Q I mean, after you got it and turned it back to the bank. It wasn't foreclosed then immediately when you turned it back?

"A I don't know what they did with it."

Lloyd Froom, an employee of the Salem Branch of the First National Bank of Portland, testified that, acting on behalf of the bank and in pursuance of its rights under the mortgage, he took possession of the equipment on February 18, 1949, and placed it in storage at the Case Tractor Company in Albany.

The effect of this evidence, which is not contradicted, is that the bank took possession of the mortgaged property for the purpose of foreclosure and sold it to the plaintiffs. The mortgage contains the following provisions touching the remedies available to the bank in the event of a default:

"* * * the Mortgagee may declare the whole sum of both principal and interest due and payable, without notice to the Mortgagor, in which event the Mortgagee shall be entitled to the immediate possession of said property and may proceed at once

to foreclose this Mortgage or to enforce the payment of the indebtedness secured hereby in such manner as may be herein provided or as may be by law authorized. Any foreclosure of this Mortgage may be made in the manner provided by law for the foreclosure of chattel mortgages, or, at the Mortgagee's option, foreclosure may be had by seizure and sale of said property at public or private sale, with or without notice to the Mortgagor. Upon default of the Mortgagor in any of the particulars hereinabove stated, or upon the happening of any of the contingencies herein mentioned, the Mortgagee, its assigns or agents, or any sheriff or other officer of the law, may take immediate possession of said property, without demand, including any equipment or accessories thereto belonging, and for this purpose may enter upon the premises where said property may be and remove the same. In the event possession of said property shall be so obtained, the Mortgagee may sell and dispose of the same and of the entire interest of the parties hereto, or their assigns, therein, at either public or private sale, without demand for performance, with or without notice to the Mortgagor (if notice is given the mailing thereof to the Mortgagor at the address below shall be sufficient), with or without having such property at the place of sale, and upon such terms and in such manner as the Mortgagee may determine, and at such sale the Mortgagee, or its assigns, may become the purchaser of said property. From the proceeds derived from such sale, the Mortgagee shall deduct all expenses incurred in renewing, repairing, keeping and/or selling such property, including a reasonable attorney fee, and the balance shall be applied upon the sums due on this Mortgage and the note secured hereby; the overplus, if any, to be paid to the Mortgagor, or his assigns or personal representatives, upon demand. If the proceeds derived from such sale shall not be sufficient, after paying all costs and expenses enumerated above, to fully pay the sums due on this Mortgage and the

note secured hereby, the Mortgagee shall have an immediate right of action on said note against the parties to said promissory note and/or Mortgage for such deficiency.''

Section 68-209, OCLA, so far as material, provides:

''Whenever in any mortgage of goods and chattels the parties to such mortgage shall have provided the manner in which such mortgage may be foreclosed, such mortgage, upon breach of the conditions thereof, may be foreclosed in the manner therein provided, and not otherwise; * * *.''

■ This statute authorizes foreclosure of a chattel mortgage in the manner provided in the mortgage. Foreclosures pursuant to provisions for private sale similar to those found in the mortgage here involved have been sustained in *Rutherford v. Eyre & Co.*, 174 Or 162, 180, 148 P2d 530, 152 ALR 1172; *Credit Service Co. v. Furney*, 128 Or 21, 271 P 738; *Ashley & Rumelin v. Lance*, 88 Or 109, 171 P 561. A provision in a chattel mortgage for a private sale without notice is valid. *Crocker v. Associate Investment Co.*, 56 Ohio App 136, 10 NE2d 153; *Clark v. Studebaker Corp.*, 35 Ohio App 54, 171 NE 602; *Campbell v. Eastern Seed & Grain Co.*, (Tex Civ App) 109 SW2d 997; *Fidelity Union Fire Ins. Co. v. Ballew-Satterfield Co.*, (Tex Civ App) 10 SW2d 163; Jones on Chattel Mortgages (5th ed) 995, § 792.

■ The failure of the bank to give the plaintiffs a bill of sale to the equipment did not invalidate the sale. Even where the statute governing foreclosure of chattel mortgages required a bill of sale to be given, it was held that failure to comply with the requirement did not affect the validity of the purchaser's title, since, as the court said, his title ''depends upon the validity of the proceedings had prior to and including the sale,

and not upon what should be thereafter done by the person making the sale." *Gandiago v. Finch,* 46 Ida 657, 667, 270 P 621. See, also, *Kent v. National Supply Co. of Texas,* (Tex Civ App) 36 SW2d 811, 816. There is nothing to indicate fraud or that the sale was not fairly conducted. There is no criticism of the amount for which the property was sold.

The defendant cited no authority for holding this sale invalid. It does assert, however, that plaintiffs "admit that they did not make the purchase for the reason that title could not be made to them and that the bank would have to start all over". We find no such admission in plaintiffs' brief or anywhere in the record. Dave Turnidge testified that they bought the property and he is not contradicted. The defendant is in no position to question his testimony on this subject in the first case because it offered this testimony in evidence in the present case, specifically, and caused it to be read into the record as part of the proof. (Later all the evidence in the first case was received in evidence in this case under a stipulation of the parties.) The check which Dave Turnidge gave to the bank in payment for the equipment is in evidence. It is dated March 4, 1949, made payable to the Salem Branch, The First National Bank of Portland, and is for $13,978.55. It is true that for some reason not clearly apparent the bank seems to have become apprehensive that the procedure was faulty, or, as Dave Turnidge expressed it, that "they slipped up on something." The bank then suggested to the plaintiffs that it would foreclose in the plaintiffs' name or take the equipment back and "go through the whole process again." The plaintiffs decided to return the equipment to the bank, which paid for it the same amount that the plaintiffs had paid the bank. Plaintiffs at that time owned the

equipment under a valid sale, and the transaction came to nothing more nor less than a resale by them to the bank. The latter's fears as to the validity of the proceedings are immaterial.

 It is argued, however, that plaintiffs, as directors of Pacific, which, it is said, was engaged in a joint adventure with the defendant in the performance of the North Umpqua contract, violated a fiduciary duty, not only to Pacific, but as well to its co-adventurer by taking possession of the property, and that they are to be regarded as trustees thereof for both members of the joint adventure. As we held in the case of *Pacific General Contractors v. Slate Construction Company,* the question whether a joint adventure actually existed is one of fact. In that case we affirmed the decision of the trial court because such a relationship had not been established as a matter of law. The testimony, we said, was conflicting, and there was substantial evidence to support the judgment. Here we find it unnecessary to decide the question. We may assume that there was such a joint adventure, and we may further assume that the plaintiffs, because they were directors of Pacific, owed some sort of a fiduciary duty to the defendant as Pacific's co-adventurer, although no authority has been cited for that proposition. Decisions involving the promoters of a corporation are beside the point, and those which stand for the general rule that members of a joint adventure owe one to another a fiduciary duty, are equally wide of the mark, because, while under the assumption made, Pacific was a joint adventurer with the defendant, the plaintiffs were not. Even under defendant's theory, moreover, plaintiffs cannot be held liable for the rental value of the DW-10's. These two pieces of equipment, contrary to assertions in the defendant's brief, were never

used on the North Umpqua job. They were used on the Estacada job, and the evidence does not warrant a finding that they were property committed to the purposes of the alleged joint adventure, which was limited to the performance of the North Umpqua contract. They were, as we have held, the property of Pacific, and only Pacific has the right to question the transaction by which the plaintiffs acquired title to them. Pacific was made a party defendant in this case, but it is not complaining.

That leaves to be determined only the question whether the plaintiffs violated any duty owed the defendant in purchasing the D-8. Defendant's view of the evidence touching this transaction is thus summarized in its opening brief:

"They [plaintiffs] ruthlessly took the property, which had been by them as directors and their corporation committed to this joint venture for the performance of a contract, from the possession of the Slate Construction Company who had the management and the primary obligation on this contract and by device of their own scheming took the property from the bank, claiming to own it as individuals, using it for a number of months, and then turning it back to the bank and forcing the bank to assume the original corporation as the obligor on the mortgage which it held against this property."

We are unable to say that the foregoing accords with the actual facts. These are disclosed by the testimony of Dave Turnidge and the bank employee, Mr. Froom, above set forth. The bank had given notice that the mortgage on the property was in default and would be foreclosed if payment was not made within a time stipulated. Dave Turnidge and his associates called a meeting of the directors of Pacific to consider

what should be done. The meeting was attended by Slate, Doughton and Fritz, all directors of defendant, as well as by the plaintiffs. At that time Pacific was practically penniless, as its money had been drawn out on checks signed by Slate as president and Doughton as secretary, and used in the purchase of equipment and for expenditures incurred on the Estacada and North Umpqua jobs. We do not suggest that Slate and Doughton, in making these withdrawals, acted without authority or were guilty of any wrongdoing. That, however, is the reason why Pacific had no funds with which to pay off the obligation. Whether the defendant could have done so does not clearly appear. We may infer that it could not, because it is shown in the evidence that late in October, 1948, the defendant was in difficult circumstances, and Slate had called upon the plaintiffs to advance additional funds, informing them that if they failed to do so "We are broke." It does not appear, however, that the defendant made any effort to refinance the mortgage and thus save the equipment which it now says was so sorely needed for the performance of the North Umpqua contract. And certainly it was not the duty of the plaintiffs, in their individual capacities, to do this. Slate was managing agent of the defendant, and appears to have transacted substantially all the business for his corporation. He had, therefore, very broad powers. See *Lane v. National Insurance Agency,* 148 Or 589, 596, 37 P2d 365; 13 Am Jur 896, Corporations, § 930. He acted for Slate Construction Company with authority when he informed the plaintiffs the next day after the meeting, "No, we are not in a position to redeem that mortgage. We will let it go."

The bank had threatened to hold Pacific liable for the deficiency if the sale of the mortgaged property did

not bring the amount of the mortgage indebtedness at forced sale, and the plaintiffs were faced with a possible personal judgment, in the event of such a deficiency, through resort to suit on their unpaid stock subscriptions. They had, therefore, an interest to protect. It was in these circumstances, and under the belief that the property was probably worth the amount of the indebtedness, that they bought it at sale on foreclosure after the bank had seized it for that purpose.

■ The plaintiffs, we find, acted in good faith and with no unlawful or fraudulent purpose, and were guilty of no act of disloyalty towards the alleged joint adventure. They bought the property only after Slate, as managing agent of the defendant, informed them of the defendant's decision to abandon any interest in the property that it may have had. The record indicates that they paid for the property its full value. They tried to sell it after making the purchase, but their efforts were unsuccessful. We think it would not be equity to require them to pay rent for its use. The amount claimed in the initial complaint was $127,780.17, being the difference between $147,726.00, the alleged reasonable rental value of the equipment, and the amount due on the mortgage given by the defendant to the United States National Bank, which the plaintiffs are here seeking to foreclose. It is not without bearing on the equities that Doughton, a director of Slate Construction Company, rented the DW-10's from Dave Turnidge in November, 1949, and that Slate, as he himself testified, knew at least by January, 1950, that the plaintiffs had taken possession of the equipment. Yet the defendant took no steps to vindicate its alleged rights until June 1, 1950, when it filed its answer in this case.

■ The plaintiff, William Glaser, was a director of

Slate Construction Company as well as of Pacific. For that reason, in respect of the D-8, of which the defendant was a co-owner with Pacific, he bore a somewhat different relation to the transaction than his co-plaintiffs. A purchase of corporate property by a director is closely scrutinized by the courts, but such a sale is not absolutely void; and if, under all the circumstances, it is equitable to uphold it, as where there is good faith and fair dealing and a purchase for an adequate consideration, the tendency of the courts has been to sustain the validity of the purchase. 13 Am Jur 961, Corporations, § 1009. See, also, 76 ALR 446; *Davis v. Hofer,* 38 Or 150, 63 P 56; *Patterson v. Portland Smelting Works,* 35 Or 96, 56 P 407; *Jones v. Hale,* 32 Or 465, 52 P 311. In this case we think it would be inequitable to permit the defendant to repudiate its express waiver of its interest in the property upon which, it may be reasonably assumed, the plaintiff, William Glaser, and the other plaintiffs relied, and to sanction its effort to hold this plaintiff, as a trustee, liable for a large amount of rent.

■ The only remaining question relates to the Chevrolet truck and mounted fuel tank. We are convinced from the evidence that possession of this property, which was in use on the North Umpqua job, was taken and retained not by the plaintiffs, but by Pacific. Any liability that there may be because of this transaction is the liability of the corporation and not of the plaintiffs.

The decree of the circuit court is affirmed.